IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WHITE SPRINGS AGRICULTURAL )
CHEMICALS, INC. d/b/a PCS PHOSPHATE – )
WHITE SPRINGS, )
 )
       Plaintiff, )  Case No. 3:11-cv-00998-J-32JRK
 )
    v. )
 )
GAFFIN INDUSTRIAL SERVICES, INC., )
AMERICAN SAFETY RISK RETENTION )
GROUP, INC., and AMERICAN SAFETY )
INDEMNITY COMPANY, )
 )
     Defendants. )
 )

## WHITE SPRINGS AGRICULTURAL CHEMICALS, INC.'S MOTION FOR SUMMARY JUDGMENT AS TO DEFENDANT GAFFIN INDUSTRIAL SERVICES, INC. AND INCORPORATED MEMORANDUM OF LAW

Plaintiff, White Springs Agricultural Chemicals, Inc. d/b/a PCS Phosphate - White Springs ("PCS")[1] moves for summary judgment on its contractual indemnity and breach of contract claims against Defendant, Gaffin Industrial Services, Inc. ("Gaffin"), on the grounds that the record evidence shows that there is no genuine dispute as to any material fact and that PCS is entitled to judgment as a matter of law.

## INTRODUCTION

PCS hired Gaffin as an independent contractor to perform waterblasting work at PCS's facility in White Springs, Florida. Gaffin agreed under the contract to indemnify and hold harmless PCS for any claims for bodily injury or death connected with Gaffin's work

---

[1] PCS has been referred to in other documents in this case as "PCS – White Springs" and as "WSA." Any reference in the record to PCS, PCS – White Springs, or WSA means the Plaintiff in this action.

for PCS. Gaffin also agreed to obtain insurance covering PCS as an additional insured, and covering Gaffin's contractual indemnity obligations.

Robert Williams ("Mr. Williams"), a Gaffin employee working at PCS's facility, was fatally injured when the extremely high-pressure stream from his waterblasting gun struck his leg, severing his femoral artery and causing him to bleed to death. Lisa Williams, Mr. Williams' widow ("Mrs. Williams"), filed a lawsuit for wrongful death against Gaffin, PCS and JetStream of Houston, LLP, the maker of the waterblasting gun (the "Williams Suit"). PCS, in turn, filed this suit against Gaffin and its insurers seeking indemnity and insurance coverage. PCS is entitled to judgment as a matter of law on its contractual indemnity claim against Gaffin because the Williams Suit is covered by the indemnification clause in the parties' contract. PCS is entitled to recover as damages its reasonable attorney's fees and expenses incurred in defending the Williams Suit.

PCS also claims that Gaffin breached its contractual obligations related to insurance coverage. Whether Gaffin breached these obligations turns on whether Gaffin's insurance policies (1) cover PCS as an additional insured and (2) cover Gaffin's indemnity obligations – disputed questions that are pending before this Court.[2] In the event the Court finds that Gaffin's insurance policies do not cover PCS as an additional insured, and/or Gaffin's contractual indemnity obligation, then Gaffin has breached its contractual insurance obligations, and PCS would be entitled to judgment on its breach of contract claim.

---

[2] These two insurance coverage issues will be decided in separate dispositive motions pursuant to the Court's order. (*See* Doc. 50.) Whether Gaffin's insurance policies cover PCS as an additional insured is addressed in PCS's Motion for Summary Judgment against American Safety Risk Retention Group, Inc., filed contemporaneously herewith. Whether Gaffin's insurance policies cover Gaffin's contractual indemnity obligation is part of Gaffin's cross-claim against its insurers (Doc. 19), and will be addressed in a separate motion for summary judgment to be filed at a later date (*see* Doc. 50).

## STATEMENT OF UNDISPUTED FACTS[3]

**A.    The Contract Between PCS and Gaffin.**

1.    PCS is in the business of mining phosphate and producing phosphoric acid, and PCS operates a phosphoric acid plant in White Springs, Florida.

2.    Gaffin is a waterblasting contractor which has been in operation for over thirty years. (Ex. A, McCleary Dep. at 7-8.)  Gaffin's main expertise is using waterblasting equipment to high pressure clean industrial facilities. (*Id*; Ex. B, Duffy Dep. at 106-07).

3.    PCS selected Gaffin to perform industrial waterblasting services during a plant turnaround at the Suwannee River Chemical Plant ("SRC") at its White Springs facility in June 2007.  (*See* Ex. C, Lessman Decl., ¶ 7; Ex. C-1, Purchase Order; Ex. D, Gaffin (1/3/2012) Dep. at 61.)

4.    PCS issued to Gaffin Purchase Order No. 50125964, dated 6/05/07 (the "Purchase Order"), calling for Gaffin to "HIGH PRESSURE CLEAN FILTERS, REACTORS, PIPELINES AND ASSOCIATED EQUIPMENT FOR SRC TURNAROUND." (Ex. C-1; Lessman Decl., ¶ 8; Gaffin (1/3/2012) Dep. at 61.)

5.    The Purchase Order called for Gaffin to "supply all labor, materials, equipment, tools, supervision, insurance, and all items of expense necessary to safely perform the 'work.'" (Ex. C-1.)  Gaffin was responsible under the contract to ensure that its employees complied with all safety rules and regulations, and "to exert primary controls . . . to obtain desired performance from his employees."  (*Id.*, Safety Requirements, p. 2 of 6.)

---

[3] All exhibits identified in this Statement of Undisputed Facts are being contemporaneously filed under a separate docket entry, along with an index of exhibits.  The parties to this case have stipulated that certain depositions taken in the Williams Suit are admissible in this suit. (Doc. 38.)

6.      Exhibit A to the Purchase Order contains General Terms and Conditions that, along with the terms on the face of the Purchase Order, govern the contractual relationship between Gaffin and PCS.  (*Id.*, p. 9)

7.      Paragraph 8 of the Terms and Conditions, under the heading "Indemnification," (the "Indemnification Clause") provides that Gaffin must indemnify and hold harmless PCS against:

> **ALL CLAIMS, LIABILITIES, LOSSES, DAMAGES, AND EXPENSES (OF EVERY CHARACTER WHATSOEVER) FOR BODILY INJURY, SICKNESS AND/OR DISEASE, INCLUDING DEATH; . . . SUSTAINED BY ANY PERSON (INCLUDING BUT NOT LIMITED TO EMPLOYEES OF OWNER, CONTRACTOR OR ANY SUBCONTRACTOR) IF SUCH INJURY, SICKNESS, DISEASE AND/OR DEATH . . . IS IN ANY WAY CONNECTED WITH THE WORK OR WITH THE PERFORMANCE OF OR FAILURE TO PERFORM THE WORK, AND UNLESS IT RESULTS FROM THE SOLE NEGLIGENCE OR WILLFUL MISCONDUCT OF [PCS].**

(*Id.*, General Terms & Conditions, ¶ 8 (emphasis in original).)[4]

8.      The Indemnification Clause further clarifies Gaffin's indemnity obligation with its "NOTICE REQUIRED BY TEXAS EXPRESS NEGLIGENCE RULE":

> **CONTRACTOR ACKNOWLEDGES THAT ITS LIABILITY AND INDEMNITY OBLIGATIONS UNDER THIS PARAGRAPH SHALL BE WITHOUT REGARD TO THE NEGLIGENCE OF OWNER, WHEN OWNER'S NEGLIGENCE IS A JOINT, CONCURRENT, OR PARTIAL (BUT NOT SOLE) CAUSE OF THE INCIDENT, OCCURRENCE OR RESULTING LOSS, DAMAGE, DESTRUCTION, INJURY, SICKNESS, DISEASE OR DEATH, AND WITHOUT MONETARY LIMIT TO THE EXTENT PERMITTED BY LAW.**

(*Id.* (emphasis in original).)  While this clause refers to a Texas rule, the notice it

---

[4] The Indemnification Clause is consistent with an indemnity provision that appears on the back-side of the Purchase Order, which provides that Gaffin must "indemnify, defend and hold harmless [PCS] ... from and against, any and all damages, claims, liabilities, losses, costs and expenses (including but not limited to attorneys' fees and litigation costs) arising out of, or resulting in any way from . . .(ii) any act or omission of [Gaffin]." (Ex. C-1, p. 8.)

contains applies with equal force to Florida contracts.

9.      Paragraph 7 of the General Terms and Conditions requires Gaffin to obtain insurance coverage prior to commencement of any work under the contract, including "[c]ommerical general liability insurance with a combined bodily/personal injury and property damage limit of US $4,000,000 for each occurrence" with "[b]lanket contractual liability insurance sufficiently broad to include" the indemnification required by the Indemnification Clause.  (*Id.* ¶ 7.)

10.     Paragraph 7 further provides that PCS "must be named additional insured" on the commercial general liability insurance policy, and that "[Gaffin] shall furnish certificates of insurance from insurers acceptable to [PCS] evidencing the required coverages requested prior to the commencement of the Work." (*Id.*)

11.     Prior to beginning its work, Gaffin purchased a commercial general liability insurance policy from American Safety Risk Retention Group, Inc. ("ASRRG"), Policy No. ENV 016484-07-01 (the "CGL Policy") with policy limits of $1 million (*see* Ex. F; Ex. G, Gustaffson Dep. at 10-14); and an excess/umbrella liability policy from American Safety Indemnity Company ("ASIC"), Policy No. ESU016444-07-01 (the "Excess Policy") with policy limits of $5 million (hereinafter, collectively referred to as "Gaffin's Insurance Policies") (Gustaffson Dep. at 14-16).

12.     PCS received a Certificate of Insurance showing that Gaffin obtained insurance coverage under Gaffin's Insurance Policies.  (Ex. I; Ex. H, Bramlett Dep. at 30.) The Certificate of Insurance was issued by Lassiter Ware Insurance, Gaffin's insurance agent, and a duly authorized representative of ASRRG and ASIC.  (*Id.*; Bramlett Dep. at 19-

20, 30-31.)  The Certificate of Insurance specifically provided that PCS is an additional insured with respect to "General Liability . . . as required by written contract."  (Ex. I.)

13.     After receiving a copy of the Certificate of Insurance, PCS signed an Insurance Limits Waiver, accepting as adequate PCS's current coverage as shown in the Certificate of Insurance. (Ex. C-3; Lessman Decl., ¶ 10.) The Insurance Limits Waiver specifically references that an Additional Insured provision is included in Gaffin's coverage. (Ex. C-3.)

14.     Gaffin commenced work under the Purchase Order on June 5, 2007. (Lessman Decl., ¶ 9.)  Gaffin fully performed the work required by the Purchase Order and was paid the contract price plus an additional amount based on the work performed. (*Id.*; Ex. C-2, Addendum to Purchase Order; Gaffin (1/3/2012) Dep. at 53-54.)

**B.     Gaffin's Work at the PCS Plant.**

15.     The subject accident occurred during the night shift that began the evening of June 10, 2007, and lasted into the morning of June 11, 2007.  (Duffy Dep. at 16-24.)   That night Gaffin's employees were performing work at multiple locations at the facility, and other contractors were working on site. (Ex. J, Bristol Decl., ¶ 4; Alvarez Dep. at 8.)

16.     On the day of the accident, PCS gave Gaffin a list of vessels that needed cleaning.  (Alvarez Dep. at 20- 21.)  But, according to Mark Alvarez, who was the lead Gaffin supervisor on the night of the accident, the timing, scheduling, manner and method of how the vessels would be cleaned was up to Gaffin.  (*Id.*)

17.     Gaffin assigned a crew that included Mr. Williams, Gerald Duffy and Fred Carter to clean the inside of the Barometric Condenser Seal Tank, also known as the "Flash

Cooler" or the "Hot Well Tank." (Alvarez Dep. 20-21; *see also* Ex. L, Safe Work Permit.)

18.     Mr. Williams was an experienced waterblaster.  (McCleary Dep. at 37-38; Duffy Dep. at 50-54.)  He had worked for Gaffin since 2003 (Gaffin (1/3/2012) Dep. at 122.) He had received training as a waterblaster, and was trained to operate a waterblasting gun in confined spaces. (McCleary Dep. at 36-37; Gaffin (1/3/2012) Dep. at p. 188; Ex. D, Alvarez Dep. at 10, 52.)  He knew how to handle a waterblasting gun, and was aware of the dangers associated with waterblasting, and the dangers of shortening the barrel.  (Alvarez Dep. at 59, 125-26; *see also* Gaffin (1/3/2012) Dep. at 213.)

### *PCS Did Not Supervise or Direct Mr. Williams' Work*

19.     Gerald Bristol, a PCS employee, was the Shift Foreman at the plant on duty on the night of Mr. Williams' accident.   (Bristol Decl., ¶ 3.)

20.     During the plant turnaround, Gerald Bristol's job responsibilities included occasionally monitoring the progress of work being performed by independent contractors. (*Id*. ¶ 5.)  His job responsibilities did not include directing the manner or method of Gaffin's work, or the work of any other independent contractor.  (*Id*.)

21.     Bristol made rounds to the various job sites on the night of the accident, briefly checking on the progress of the work, and then moving on. (*Id.* ¶ 8.)  According to Gaffin's employees on site, Bristol came around every fifteen to twenty minutes, stopping by and looking, but not standing and watching.  (Duffy Dep. at 144; Alvarez Dep. at 22.)

22.     Neither Bristol nor any other PCS employee directed or supervised Gaffin's work that night.  (Bristol Decl., ¶ 10.)  Bristol was the only PCS employee present on the job site at all during Mr. Williams' work in the Hot Well Tank. (*Id.*, ¶ 11.)

### *Gaffin Chose Not to Use 3D Waterblasting*

23.     The Purchase Order did not specify or direct what method of waterblasting Gaffin should use on the Hot Well Tank, or any other facility.  But, it did provide that Gaffin would provide all equipment, which would include all waterblasting equipment and personal protective equipment ("PPE").  (Ex. C-1)

24.     According to Mark Gaffin and Dan McCleary, the co-owners of Gaffin, and according to Alvarez, Gaffin was aware of 3D waterblasting technology, and owned a 3D system called the "Hurricane" system that allowed the operator to lower a nozzle into a confined space from the top, without entering the tanks, with high pressure streams spraying in every direction. (Gaffin (1/3/2012) Dep. at 63-65; McCleary Dep. at 39-40; Alvarez Dep. at 12, 14.)  The Contract provided pricing for 3D waterblasting, had Gaffin chosen it.  (Ex. C-1, Exhibit D to Purchase Order.)

25.     According to Mark Gaffin, it was Gaffin's decision, not PCS's, whether to use 3D waterblasting technology on a particular job.  (Gaffin (1/3/2012) Dep. at 65, 352.)  In particular, the supervisors on the job – in this case Duffy or Alvarez – would make the decision whether to use 3D water blasting as opposed to manual.  (*Id.* at 70.)

26.     Gaffin chose not to use 3D technology to clean the Hot Well Tank on the night of the accident, but instead elected to use manual waterblasting equipment with a man inside to clean the Hot Well Tank.  (Alvarez Dep. at 18-19.)

### *Gaffin Shortened the Barrel  Used in the Hot Well Tank*

27.     Gaffin supplied all equipment for the job, including the waterblasting gun, lighting, and personal protective equipment ("PPE") used by Mr. Williams.  (Duffy Dep. at

156-157.)

28.     Robert Williams was using a yellow-handled gun manufactured by JetStream to clean the inside of the hot well tank.  (Alvarez at 52-53, 81-82; Duffy Dep. at 45; Gilileo Dep. at 19-25.)

29.     The yellow-handled gun was stamped with warnings: "DANGER DO NOT SHORTEN BARREL MIN 48 INCH FRONT BARREL LENGTH;" and "DANGER USE MINIMUM 48 INCH FRONT AND 14 INCH REAR BARREL." (Ex. Q.)

30.     According to Gaffin's employees, this warning was apparent on the handles of the gun and Gaffin's employees were aware of the warnings.  (Duffy Dep. at 97-98; Alvarez Dep. at 144-45.)

31.     Gaffin received literature with each waterblasting gun from JetStream, which said, in pertinent part:

> "**WARNING:**  A 48" long discharge barrel **MUST** be used on handheld control guns to prevent nozzle discharge from accidentally striking the operator's feet, legs or body.  **DO NOT USE A HANDHELD CONTROL GUN IF ITS NOZZLE DISCHARGE CAN ACCIDENTLY STRIKE OPERATOR'S BODY."**

(Ex. P; Ex. N, Padilla Dep. at 39; McCleary Dep. at 106-07.)

32.     McCleary, who was in charge of operations at Gaffin, admitted Gaffin knew before the accident of the warnings not to shorten the gun in this manner.  (McCleary Dep. at 106-07; Gaffin (1/3/2012) Dep. at 8.)

33.     In spite of these warnings, Gaffin had shortened the front barrel of the yellow-handled waterblasting gun to approximately 28 inches.  (McCleary Dep. at 86-87; Ex. Q.)

34.     According to Mark Gaffin, it was McCleary's decision to shorten the barrels

for a particular job. (Gaffin (1/3/2012) Dep. at 84.) The waterblasting gun had been shortened back in Gaffin's machine shop in Tampa before this job. (McCleary Dep. at 67-68.)

35.     PCS did not know before the accident that Gaffin had shortened the barrels of its waterblasting guns. (McCleary Dep. at 68; Alvarez Dep. at 57, 60; Bristol Decl., ¶ 13.)

36.     At their depositions, JetStream employees demonstrated the method the manufacturer recommends for using its waterblasting guns with full-length, unshortened barrels. (*See* Padilla Dep. at 66-70; Ex. O, Slovak Dep. at 20-25, Ex. R, video excerpt of Padilla and Slovak Depositions.)

37.     The gun depicted in the video at Exhibit R is the same model that Mr. Williams was using, in the condition that it would have been shipped to Gaffin. (*Id.*) As demonstrated in this video, the manufacturer's recommended barrel length provides a geometric protection from the risk of injury from the waterblasting gun's stream. (*See* Ex. R.; *see also* Ex. S, Decl. of Dr. David Summers; Ex. S-1, Summers Expert Report.) That is, at the recommended length it would be impossible for a person of Mr. Williams' height to aim the waterblasting gun at his lower extremities. (Ex. S-1.) But, the shortening of the barrel made it possible for Mr. Williams to shoot himself in the leg. (*Id.*)

38.     Gaffin made other modifications to the barrel that increased the thrust of the yellow-handled waterblasting gun. (Ex. S-1) Dr. David Summers, a waterblasting expert, personally examined the waterblasting gun and determined that the gun as used by Mr. Williams would have caused a back thrust of 93.5 lbs. (*Id.*) Industry standards call for a maximum thrust of one-third the body weight of the user. (*Id.*) For a person of Mr.

Williams' weight, the maximum back-thrust would have been approximately 72 lbs. (*Id.*)

**C.    The Accident.**

39.    Mr. Williams began waterblasting the north side of the Hot Well Tank at around 9:00 PM. (Duffy Dep. at 17.)  He finished descaling the north side of the tank, took a break, and then started cleaning the south side of the tank.  (*Id.*)  He took several breaks along the way, but insisted on finishing the job himself.  (*Id.*)

40.    Shortly after midnight, Mr. Williams was working inside the tank, and Duffy and Carter heard a yell from inside of the tank. (Duffy Dep. at 22-23.)  Mr. Williams crawled out of the tank and said "I hit my damn leg . . . the damn gun got stuck."  (*Id.* at 24.)

41.    Bristol and Alvarez arrived on the scene as Mr. Williams was crawling out of the tank, and attempted to administer first aid.  (Alvarez Dep. at 27; Bristol Decl., ¶ 12.)

42.    The stream from the waterblasting gun, which was operating at an estimated 9,500 psi, struck Mr. Williams' right inner thigh, just above the knee, severing his femoral artery and causing him to lose massive amounts of blood.  (Ex. T, Autopsy Report.)  He lost consciousness within minutes after crawling out of the tank, and was dead before reaching the hospital. (*Id.*; Alvarez Dep. at 29.) The cause of death was listed on the Autopsy Report as hypovolemic shock. (Ex. T.)

43.    OSHA investigated the incident starting the day of the accident, June 11, 2007.  OSHA found that Gaffin had violated OSHA regulations by shortening the barrel of the waterblasting gun, a hazard which caused or was likely to cause death or serious physical harm to Gaffin's employees, and issued a "Willful" citation to Gaffin on December 4, 2007. (*See* Gaffin (1/3/2012) Dep. at 102-03; Ex. U.)

44.    With Gaffin's consent, OSHA changed the type of violation from "Willful" to "Serious" upon entering a settlement agreement with Gaffin.  (*Id*.)

**D.    The Williams Suit.**

45.    Mrs. Williams originally filed the Williams Suit in the Circuit Court of Hillsborough County, Florida, naming as defendants PCS, Gaffin, and JetStream.  PCS and JetStream removed the case to Federal court.  (Ex. V; *see also Williams v. PCS Phosphate Company, Inc.*, Case No. 3:10-cv-549, Docs. 1, 2.)

46.    PCS tendered defense of the Williams Suit to Gaffin and its insurers.  (*See* Exs. X, Y.)  Neither Gaffin nor its insurers provided a defense to PCS.  (*Id*.; Ex. E, Gaffin (7/18/2012) Dep. at 50-54.)  As a result, PCS incurred attorney's fees and expenses in defense of the Williams Suit.  ASRRG agreed to defend Gaffin in the Williams Suit, and in this suit, under a reservation of rights.  (Ex. Y, p. 20)

47.    After the Williams Suit was remanded to state court, and re-removed to federal court, Mrs. Williams amended her complaint (Case No. 3:10-cv-549, Doc. 67), and quickly amended her complaint again (Case No. 3:10-cv-549, Doc. 82).  The Second Amended Complaint was the final operative complaint in the Williams Suit.  (Ex. W.)

48.    The Second Amended Complaint purports to allege two counts against: one for negligence (Count I), and one for strict liability based on an alleged ultra-hazardous/inherently dangerous activity (Count II).  (Ex. W.)   Count II is a claim seeking to hold PCS liable for Gaffin's negligence. (*Id.*)  The Second Amended Complaint also included a products liability claim against JetStream. (*Id.*)  After PCS and JetStream re-removed the case to federal court, Mrs. Williams' claims against Gaffin continued to proceed

in state court. (*Id.*)

49.    Mrs. Williams has never alleged that Mr. Williams' death was solely the result of PCS's negligence.  Each iteration of the Williams Suit alleged that Gaffin, JetStream and PCS jointly caused Mr. Williams' death. (Case No. 3:10-cv-549, Doc. 2, p. 8; Doc. 67, p. 11; Doc. 82, p. 10; Exs. V, W.)

## ARGUMENT AND CITATION OF AUTHORITY

### A.    Summary Judgment Standard.

Summary judgment is required where, as here, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The non-moving party cannot refute a properly supported summary judgment motion with mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial.  *Id.* at 256; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987).  Here, the undisputed facts demonstrate that PCS is entitled to judgment as a matter of law on its claims of contractual indemnity and breach of contract.

### B.    The Indemnification Clause Requires Gaffin to Indemnify PCS for the Claims in the Williams Suit.

The Indemnification Clause in the agreement between PCS and Gaffin requires that Gaffin must indemnify and hold harmless PCS for any bodily injury, including death, connected to Gaffin's work for PCS, unless the bodily injury or death results from the "sole negligence or willful misconduct" of PCS.  Thus, in order for PCS to recover from Gaffin, PCS need only establish the injury or death was "connected" to the performance of Gaffin's work for PCS, and that the injury did not result from PCS's "sole negligence or willful

misconduct." Thus, the plain language of the Indemnification Clause indicates that if any party other than PCS – whether Gaffin, Mr. Williams, or some other party – contributed to Mr. Williams' accident, even if PCS's alleged negligence was a joint cause, then Gaffin must indemnify and hold harmless PCS.

First, it is undisputed that Williams' death was "connected" with the performance of Gaffin's work under the contract. Williams was fatally injured while performing the very work that Gaffin was hired to do – waterblasting the inside of a tank at PCS's facility in White Springs, Florida.

Second, it is undisputed that Williams' injury did not result from PCS's "sole negligence or willful misconduct." Gaffin has conceded that PCS was not solely negligent with respect to Mr. Williams' death. (Gaffin (7/18/2012) Dep. at 70-72.) Also, Ms. Williams never alleged that PCS was solely negligent. The Williams Suit alleged that Gaffin, PCS, and JetStream had all committed negligent or willful acts resulting in Mr. Williams' death. Thus, the Williams Suit, on the face of the Second Amended Complaint, fits the category of claims described in the Indemnification Clause: it was a claim that resulted from Gaffin's work, and was not the result of the sole negligence or willful misconduct of PCS.

Moreover, the facts developed through discovery in the Williams Suit demonstrate that Mr. Williams' death did not result from PCS's sole negligence or willful misconduct. Rather, the proven facts in this case indicate that PCS was not negligent at all, much less solely negligent. Gaffin was in control of Mr. Williams' work, and was negligent in shortening the barrel of the waterblasting gun, which was a direct cause of Mr. Williams'

14

fatal injuries.

Gaffin was an independent contractor hired by PCS to do waterblasting work, and PCS turned its facility over to Gaffin to complete the job.  Gaffin was responsible for the safety of its employees, and was responsible under the terms of the contract for supplying all equipment, including safety equipment and the waterblasting gun.  Moreover, it was up to Gaffin to decide whether to use automated 3-D waterblasting technology, eliminating the need to put a man inside the tank, or to use manual waterblasting.  Gaffin was a waterblasting expert, which is precisely why PCS hired Gaffin to perform high pressure cleaning, and turned over the facility to complete the job.

Gaffin shortened the yellow-handled waterblasting gun in violation of the manufacturer's recommendations, but PCS did not know about the shortening of the waterblasting gun until after Mr. Williams' accident.  Gaffin had shortened the waterblasting gun back in its shop before coming to White Springs to perform the work under the Purchase Order.

Gaffin's shortening of the waterblasting gun was the direct cause of Mr. Williams' accident.  Had Gaffin not shortened barrel, Mr. Williams could never have shot himself in the leg with the waterblasting gun's high powered stream of water.  The waterblasting gun, as manufactured, has built in geometric protections.  At the proper barrel length, it is impossible for someone of Mr. Williams' height to aim the waterblasting gun at his lower extremities.  A review of the video at Exhibit R showing JetStream employees wielding the waterblasting gun demonstrates the geometric protections built in to the gun as manufactured.   Shortening the barrel length made it possible for Mr. Williams to shoot himself in the leg.

Accordingly, the undisputed facts of this case show that Mr. Williams' death did not solely result from PCS's negligence. Even if PCS was jointly negligent, which it denies, its negligence was not the sole cause of Mr. Williams' death. At a minimum, Gaffin's negligence in shortening the barrel was a direct cause of the accident that led to Mr. Williams' death. The Williams Suit was a claim for wrongful death connected to Gaffin's work for PCS, and the accident was not solely caused by PCS. Thus, Gaffin has an indemnity obligation to PCS under the terms of the Indemnity Clause.

## C.  Gaffin's Indemnity Obligation Requires it to Pay PCS's Attorney's Fees and Expenses Incurred in Defending the Williams Suit.

The Indemnification Clause entitles PCS to recover from Gaffin all "expenses (of every character whatsoever)" that result from bodily injury, including death, connected with Gaffin's work. This includes attorney's fees and expenses incurred in the Williams Suit.[5]

Florida law generally provides that an indemnitee under an indemnification agreement is entitled to recover, as part of his damages, reasonable attorney's fees, and reasonable and proper legal costs and expenses, which he is compelled to pay as the result of suits by or against him in reference to the matter against which he is indemnified." *Ins. Co. of N. Am. v. King*, 340 So. 2d 1175, 1176 (Fla. 4th DCA 1976) (citing *Fontainebleau Hotel Corp. v. Postol*, 142 So.2d 299 (Fla. 3d DCA 1962)); *Hiller Group, Inc. v. Redwing Carriers, Inc.*, 779 So. 2d 602, 604 (Fla. Dist. Ct. App. 2001); *Shannon v. Kaiser Aluminum & Chem. Corp.*, 749 F.2d 689, 690 (11th Cir. 1985). This rule is equally applicable even when the indemnification provision does not specifically provide for the payment of attorney's fees,

---

[5] This is consistent with the scope of recovery permitted by the indemnification provision on the back side of the Purchase Order, which provides entitlement to "costs and expenses (including but not limited to attorneys' fees and litigation costs)." *See supra* n.4.

and even where the indemnitee is successful in his defense of the underlying suit. *Shannon*, 749 F.2d at 690-91 (citing *Mut. Employees Trademart, Inc. v. Armour Serv. of Fla., Inc*., 170 So.2d 64 (Fla. 3d DCA 1964)). This is a key feature that distinguishes an indemnity claim from a contribution claim.

PCS tendered defense of the Williams Suit to Gaffin and Gaffin's insurers.  Gaffin never responded and Gaffin's Insurers declined to defend PCS.  As a result, PCS was compelled to pay its own attorney's fees and expenses in defending the Williams Suit.   PCS originally sought to recover from Gaffin any amounts paid to Mrs. Williams, plus its attorney's fees and expenses in defending the Williams Suit.  Pursuant to the terms of a settlement agreement that resolved the Williams Suit, PCS is not seeking to recover the settlement payment it made to Mrs. Williams.  PCS is still seeking, and is entitled to recover, its reasonable attorney's fees and expenses incurred in defending the Williams Suit.

**D.     The Indemnification Clause is Valid and Enforceable Under Florida Law.**

Unquestionably, the Indemnification Clause is valid and enforceable under Florida Law.  Even contracts providing for indemnification for one's own negligence are allowed in Florida so long as they express intent to indemnify in "clear and unequivocal" terms against the indemnitee's own wrongful acts.  *Univ. Plaza Shopping Ctr. v. Stewart*, 272 So. 2d 507 (Fla. 1973).  The same rule applies to joint negligence – that is, a contract that clearly and unequivocally expresses intent to indemnify a party where both parties are found to be jointly at fault will be upheld.  *See Charles Poe Masonry, Inc. v. Spring Lock Scaffolding Rental Equip. Co.*, 374 So. 2d 487, 489-90 (Fla. 1979).

 In this case, the Indemnity Clause is specific enough to put the indemnitor, Gaffin,

on notice that it must indemnify the indemnitee, PCS, where the parties are jointly negligent. The language "unless it results from the sole negligence" makes plain that if the alleged damages are not the result of the sole negligence of PCS, but of the joint negligence of PCS and Gaffin, Gaffin will be required to indemnify PCS.  The Indemnification Clause provides further clarity that Gaffin's indemnity obligation is "without regard to the negligence of [PCS], when [PCS's] negligence is a joint, concurrent, or partial (but not sole) cause of the incident."[6]

The Indemnity Clause is virtually identical to language found in other cases to be sufficiently specific to permit indemnification in situations involving allegations of joint negligence.  *See Mitchell Maintenance Sys. v. State Dep't of Transp.*, 442 So. 2d 276 (Fla. 4th DCA 1983); *United Parcel Serv. of Am., Inc. v. Enforcement Sec. Corp.* 525 So.2d 424, 425-26 (Fla. 1st DCA 1987).  For example, in *United Parcel Service of America, Inc.*, the court found that a clause requiring a vendor to indemnify UPS for claims arising under the its work "except from and against all losses, damages, expense . . . arising out of the sole negligence of UPS" was sufficient to manifest the "unequivocal intent" to indemnify UPS where UPS and the vendor were jointly negligent. *Id.* 525 So.2d at 425-26 (emphasis added).

Accordingly, the Indemnity Clause is valid and enforceable, and must be applied under the circumstances of this case.

**E.     PCS is Entitled to Judgment on its Breach of Contract Claims Continent Upon the Resolution of Coverage Issues.**

The contract between Gaffin and PCS required that Gaffin procure a commercial

---

[6] Although this phrase appears under the heading "NOTICE REQUIRED BY TEXAS EXPRESS NEGLIGENCE RULE," it is entirely consistent with the requirement under Florida law that indemnity for one's own joint language be expressed "clearly and unequivocally."

general liability insurance policy with limits of $4 million per occurrence.  Prior to beginning

its work under the Purchase Order, Gaffin purchased the CGL Policy from ASRRG in the

amount of $1 million, and the Excess Policy from ASIC in the amount of $5 million.  Gaffin

presented PCS with a Certificate of Insurance showing that Gaffin obtained insurance

coverage under Gaffin's Insurance Policies, and showing PCS as an additional insured under

Gaffin's Insurance Policies.  PCS signed the Insurance Limits Waiver and agreed to accept as

adequate the $6 million coverage limits of Gaffin's Insurance Policies.  The Insurance Limits

Waiver did not waive the requirement in the contract that PCS be named and covered as an

additional insured on Gaffin's insurance policies.

        The Certificate of Insurance lists PCS as an additional insured on, but Gaffin's

insurers have taken the position that PCS is not covered as an additional insured on either the

CGL Policy or the Excess Policy.  Merely having PCS listed on a certificate of insurance for

policies that do not actually afford coverage to PCS would not fulfill not fulfill Gaffin's

contractual obligations.  The requirement that PCS "shall be named additional insured" on

Gaffin's insurance policies means that PCS must be "insured to protect it from all claims,

suits or liabilities" to the same extent as Gaffin.  *Cone Bros. Contracting Co. v. Ashland-*

*Warren, Inc.*, 458 So. 2d 851, 855 (Fla. 2d DCA 1984).  Contemporaneous with the filing of

this motion, PCS is moving for summary judgment against ASRRG on its claim for coverage

as an additional insured.  In the event that the Court finds that Gaffin's insurance policies do

not cover PCS as an additional insured, then Gaffin has breached its contract with PCS.

        Also, the Contract requires Gaffin to procure insurance coverage with "[b]lanket

contractual liability insurance sufficiently broad to include" the indemnification clause.  (Ex.

C-1, p. 9 ¶ 7.)  Gaffin filed a cross-claim for coverage of its indemnity obligations under the insured contract language in its insurance policies, claiming it is entitled to recover from its insurers the amount of any indemnity obligation Gaffin has to PCS.  Pursuant to the scheduling order entered by this Court, Gaffin will move for summary judgment on that issue at a later date.[7]  (Doc. 50.)  In the event that this Court rules against Gaffin on its coverage cross-claim, then Gaffin has breached its contractual obligation to procure insurance coverage sufficient to cover the Indemnification Clause, and PCS is entitled to damages.

## <u>CONCLUSION</u>

For the foregoing reasons, PCS respectfully requests that the Court enter an order granting summary judgment to PCS on its claims against Gaffin as set forth above.

/s/ Leland H. Kynes
Alfred B. Adams III
Georgia Bar No. 002300 (*admitted pro hac vice*)
al.adams@hklaw.com
Leland H. Kynes
Florida Bar No. 037120
leland.kynes@hklaw.com
HOLLAND & KNIGHT, LLP
Suite 2000, One Atlantic Center
1201 West Peachtree Street, N.E.
Atlanta, Georgia  30309-3400
(404) 817-8500
(404) 881-0470 (fax)

Timothy J. Conner
Florida Bar No. 767580
timothy.conner@hklaw.com
HOLLAND & KNIGHT, LLP
50 North Laura Street, Suite 3900
Jacksonville, Florida 32202
(904) 353-2000

---

[7] Because PCS has a stake in the outcome of Gaffin's cross-claim, it likely will request the opportunity to participate in briefing the issue when the time comes.

(904) 358-1872 (fax)

*Attorneys for White Springs*
*Agricultural Chemicals, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to:

Frank H. Cole, Jr., Esq., Fcole@ejlawjax.com

John R. Catizone, Esq., catizone@litchfieldcavo.com

Melanie B. Chapman, Esq., chapman@litchfieldcavo.com

/s/ Leland H. Kynes
Leland H. Kynes

#23250922_v1

21