UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WHITE SPRINGS AGRICULTURAL )
CHEMICALS, INC. d/b/a PCS )
PHOSPHATE COMPANY, INC., )
)
    Plaintiff, ) Case No. 3:11-cv-998-J-32-JRK
)
vs. )
)
GAFFIN INDUSTRIAL SERVICES, INC., )
AMERICAN SAFETY RISK RETENTION )
GROUP, INC., and AMERICAN SAFETY )
INDEMNITY COMPANY, )
)
    Defendants. )
_____)

## GAFFIN INDUSTRIAL SERVICES, INC.'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, COUNTER MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Defendant, GAFFIN INDUSTRIAL SERVICES, INC., (hereinafter "GAFFIN"), by and through its undersigned counsel hereby serves its Response to Plaintiff, WHITE SPRINGS AGRICULTURAL CHEMICALS, INC. d/b/a PCS PHOSPHATE COMPANY, INC. (hereinafter "PCS") Motion for Summary Judgment. In summary, GAFFIN would argue that the pleadings and record evidence, particularly the Second Amended Complaint in the underlying Williams suit and the PCS Purchase Order relating to the work being performed by GAFFIN, support a finding that GAFFIN was not obligated to defend or indemnify PCS in the underlying Williams suit. Additionally, the record evidence supports a finding that GAFFIN fulfilled its contractual obligations to procure insurance coverage required under the Purchase Order. Accordingly, GAFFIN is entitled to judgment as a matter of law.

## BACKGROUND

1. PCS is in the business of mining phosphate and producing phosphoric acid, and PCS operates a phosphoric acid plant in White Springs, FL.

2. GAFFIN is a water-blasting contractor which has been in operation for over thirty years *(Ex. I, McCleary Deposition, at 7-8)*. GAFFIN's main expertise is using water-blasting equipment to high pressure clean industrial facilities. *(Ex. J, Duffy Deposition, at 106-107)*.

3. PCS selected GAFFIN to perform industrial water-blasting services during a plant turnaround at the Suwannee River Chemical Plant ("SRC") at its White Springs facility in June 2007. *(See Ex. F, Lessman Declaration, ¶ 7; Ex. D, Purchase Order; and see also Ex. K, Gaffin Deposition (01/03/12) at 61)*.

4. PCS issued to GAFFIN Purchase Order No.: 50125964, dated June 5, 2007 (the "Purchase Order"), calling for GAFFIN to 'HIGH PRESSURE CLEAN FILTERS, REACTORS, PIPELINES AND ASSOCIATED EQUIPMENT FOR SRC TURNAROUND." *(Ex. F, Lessman Declaration ¶ 8)*.

5. The subject accident occurred during the night shift that began the evening of June 10, 2007, and lasted into the morning of June 11, 2007. *(Ex. J, Duffy Deposition, at 16-24)*. That night GAFFIN's employees were performing work at multiple locations at the facility, and other contractors were working on site. *(Ex. G, Bristol Declaration, ¶ 4)*.

6. One the day of the accident, PCS gave GAFFIN a list of vessels that needed cleaning. *(Ex. L, Alvarez Deposition, at 20-21)*. But, according to Mark Alvarez, who was the lead GAFFIN supervisor on the night of the accident, the timing, scheduling, manner and method of how the vessels would be cleaned was up to GAFFIN *(Id.)*

7. GAFFIN assigned a crew that included Mr. Williams, Gerald Duffy and Fred Carter to clean the inside of the Barometric Condenser Seal Tank, also known as the "Flash Cooler" or the "Hot Well Tank." *(Ex. L, Alvarez Deposition, at 20-21; see also Ex. E, Safe Work*

*Permit).*

8. Mr. Williams was an experienced water-blaster. *(Ex. I, McCleary Deposition, at 37-38); Ex. J, Duffy Deposition, at 50-54).* He had worked for GAFFIN since 2003 *(Ex. K, Gaffin 01/03/2012 Deposition at 122).*

9. Mr. Williams began water-blasting the north side of the Hot Well Tank at around 9:00pm. *(Ex. J, Duffy Deposition, at 17).* He finished the north side of the tank, took a break, and then started cleaning the south side of the tank. *(Id.)* He took several breaks along the way, but insisted on finishing the job himself. *(Id.)*

10. Shortly after midnight, Mr. Williams was working inside the tank, and Duffy and Carter heard a yell from inside of the tank. *(Ex. J, Duffy Deposition, at 22-23).* Mr. Williams crawled out of the tank and said "I hit my damn leg.. the damn gun got stuck." *(Id. at 24)*

11. The stream from the water-blasting gun, which was operating at an estimated 9,500 psi, struck Mr. Williams' right inner thigh, just above the knee, severing his femoral artery and causing him to lose massive amounts of blood. *(Ex. Q, Autopsy Report.)* He lost consciousness within minutes after crawling out of the tank, and was dead before reaching the hospital. *(Ex. L, Alvarez Deposition, at 29).* The cause of death was listed on the Autopsy Report as hypovolemic shock.

## **PROCEDURAL HISTORY**

1. Mrs. Williams originally filed the Williams suit in the Circuit Court of Hillsborough County, Florida, naming as Defendants, PCS, GAFFIN, and JetStream. (*Williams v. PCS Phosphate Company, Inc.; Case No.: 3:10-cv-549, Docs, 1 & 2.)* GAFFIN immediately moved to dismiss the Complaint based upon Workers' Compensation Immunity and the Doctrine of Election of Remedies. Virtually simultaneously, Defendants, JetStream and PCS removed the

case to Federal District Court on the basis of Fraudulent Joinder. Eventually, the case was remanded back to the Circuit Court of Hillsborough County where GAFFIN's Motion to Dismiss was heard and granted thereby removing GAFFIN from this action.

2. After GAFFIN's Motion to Dismiss was granted, the remaining Defendants, JetStream and PCS, re-removed to Federal District Court. Thereafter, Mrs. Williams amended her Complaint *(Case No.: 3:10-cv-549; Doc 67; Ex. B, Amended Complaint)*, and quickly amended her Complaint again *(Case No.: 3:10-cv-549; Doc 82; Ex. C, Second Amended Complaint)*. The Second Amended Complaint was the final operative complaint in the Williams suit.

## THE COMPLAINTS IN THE WILLIAMS CASE

1. In all three versions of the underlying Complaint, Mrs. Williams alleged active, direct negligence against PCS. In her original Complaint, Mrs. Williams alleged negligence against PCS for failing to follow OSHA regulations, failing to keep its premises in a reasonably safe condition, failing to give adequate warning of dangerous conditions, failing to properly control and supervise its agents, and for allowing Mr. Williams into a confined space with a modified, shortened-barrel high-pressure water blast gun without proper protective gear *(See Ex. A; Count III)*. Mrs. Williams also alleged that PCS retained the right or exercised control over work on its premises on the date of Mr. Williams' death and was negligent in the exercise of that control. *(See Ex. A, County IV)*. Finally, Mrs. Williams alleged that PCS' duties to Robert Williams were non-delegable duties and that its negligence was proximate case of his death. *(See Ex. A, Count V)*.

2. In her Amended Complaint, Mrs. Williams did not even name GAFFIN as a Defendant. Instead, she alleged negligence against PCS for its alleged failure to provide the proper protective equipment, a proper and unmodified, reasonably safe high-pressure water blast gun, and lighting adequate to safely perform the work. *(See Ex. B, Count III)*. Mrs. Williams also

4

alleged that PCS negligently failed to maintain its premises in a reasonably safe condition *(Id.)* Finally, Mrs. Williams alleged "strict liability for ultra-hazardous/ inherently dangerous activity" against PCS *(Id.)*.

3. In the Second Amended Complaint, Mrs. Williams again did not name GAFFIN and alleged land owner liability against PCS for a failure to maintain the premises in a reasonably safe condition, breach of statutory duties related to maintenance of its premises and negligence related to maintenance of the premises. *(See Ex. C, Counts, I, II, and III)*. The Second Amended Complaint also asserted causes of action for PCS' breach of non-delegable duty and retained control. *(Id. at County IV and V)*.

## THE PURCHASE ORDER

1. PCS issued to GAFFIN Purchase Order No.: 50125964m dated June 5, 2007 (the "Purchase Order"), calling for GAFFIN to "HIGH PRESSURE CLEAN FILTERS, REACTORS, PIPELINES AND ASSOCIATED EQUIPMENT FOR SRC TURNAROUND." *(Ex. K; Gaffin (01/03/12 Deposition, at 61)*.

2. Paragraph 8 of the Terms and Conditions, under the heading "Indemnification" (the "Indemnification Clause") provides that GAFFIN must indemnify and hold harmless PCS against:

> **ALL CLAIMS, LIABILITIES, LOSSES, DAMAGES, AND EXPENSES (OF EVERY CHARACTER WHATSOEVER) FOR BODILY INJURY, SICKNESS AND/ OR DISEASE, INCLUDING DEATH;... SUSTAINED BY ANY PERSON (INCLDING, BUT NOT LIMITED TO EMPLOYEES OF OWNER, CONTRACTOR, OR SUBCONTRACTOR) IF SUCH INJURY, SICKNESS, DISEASE, AND/ OR DEATH ... IS IN ANY WAY CONNECTED WITH THE WORK AND WITH THE PERFORMANCE OF OR FAILURE TO PERFORM THE WORK, AND UNLESS IT RESULTS FROM THE SOLE NEGLIGENCE OR WILLFUL MISCONDUCT OF [PCS].**

*(Id. General Terms & Conditions, ¶ 8 (emphasis in original.)*

3. Paragraph 7 of the General Terms & Conditions requires GAFFIN to obtain

5

insurance coverage prior to commencement of any work under the contract, including "[c]ommercial general liability insurance with a combined bodily/ personal injury and property damage limit of US $4,000,000 for each occurrence" with "[b]lanket contractual liability insurance sufficiently broad to include" the indemnification required by the Indemnification Clause. *(Id. ¶ 7)*

4. Paragraph 7 further provides that PCS "must be named additional insured" on the commercial general liability insurance policy, and that "[Gaffin] shall furnish certificates of insurance from insurers acceptable to [PCS] evidencing that required coverages requested prior to the commencement of the Work". *(Id.)*

5. Prior to beginning its work, GAFFIN purchased a commercial general liability insurance policy from American Safety Risk Retention Group, Inc. ("ASRRG"), Policy No.: ENV 016484-07-01 (the "CGL Policy") with policy limits of $1 million *(Ex. O, Gustafson Deposition, at 10-14)*; and an excess/ umbrella policy from American Safety Indemnity Company ("ASIC"), Policy No.: ESU 016444-07-01 (the "Excess Policy") with policy limits of $5 million *(Ex. O, Gustafson Deposition, at 14-16)*(hereinafter, collectively referred to as "GAFFIN's Insurance Policies" *Ex. P*).

6. PCS received a Certificate of Insurance showing that GAFFIN obtained insurance coverage under GAFFIN's Insurance Policies *(Ex. P, Ex. N, Bramlett Deposition, at 30)*. The Certificate of Insurance was issued by Lassiter Ware Insurance, GAFFIN's insurance agent, and a duly authorized representative of ASRRG and ASIC. *(Id. Bramlett Deposition, at 19-20, 30-31)*. The Certificate of Insurance specifically provided that PCS is an additional insured with respect to "General Liability… as required by written contract." *(Ex. D-2)*.

7. After receiving a copy of the Certificate of Insurance, PCS signed an Insurance Limits Waiver, accepting as adequate PCS's current coverage as shown in the Certificate of Insurance. *(Ex. D-3)*. The Insurance Limits Waiver specifically references that an Additional

6

Insured provision is included in GAFFIN's coverage. *(Ex. D-3)*.

8. GAFFIN commenced work under the Purchase Order on June 5, 2007. *(Ex. D)*. GAFFIN fully performed the work required by the Purchase Order and was paid the contract price plus an additional amount based on the work performed. *(Id.; see also Ex. D-2; Addendum to Purchase Order; & Ex. K, Gaffin (01/03/12) Deposition, at 53-54)*.

### GAFFIN DID NOT HAVE A DUTY TO DEFEND PCS

1. PCS argues that the Purchase Order between GAFFIN and PCS created a duty upon GAFFIN to defend PCS in the underlying action. In fact, the Purchase Order does not create any such duty on the part of GAFFIN. The relevant portion of the Purchase Order states as follows:

> **CONTRACTOR SHALL INDEMNIFY AND HOLD HARMLESS OWNER, ITS AFFILIATES, EMPLOYEES AND AGENTS AGAINST ALL CLAIMS, LIABILITIES, LOSSES, DAMAGES AND EXPENSES (OF EVERY CHARACTER WHATSOEVER) FOR BODILY INJURY, SICKNESS, DISEASE, AND/ OR DEATH ... SUSTAINED BY ANY PERSON ... IF SUCH INJURY, SICKNESS, DISEASE, AND/ OR DEATH... IS IN ANY WAY CONNECTED WITH THE WORK, OR WITH THE PERFORMANCE OR FAILURE TO PERFORM THE WORK, AND UNLESS IT RESULTS FROM THE SOLE NEGLIGENCE OR WILLFUL MISCONDUCT OF OWNER.**

*See Ex. D, Purchase Order.*

2. The standard to determine GAFFIN's duty to defend under the Purchase Order is clear. Between two contracting parties, the duty to defend must be determined solely from the allegations in the Complaint against the party seeking a defense. *State of Florida Department of Transportation v. Southern Bell Telephone and Telegraph Company, Inc.*, 653 So.2d 74 (Fla. 1st DCA 1994)(citing *Baron Oil Co. v. Nationwide Mutual Fire Insurance Company*, 470 So.2d 810 (Fla. 1st DCA 1985).

7

The Court in *National R.R. Passenger Corp. v. Rountree Transp. & Rigging, Inc.*, 286 F.3d 1233, 1261 (11th Circuit 2002) further explained the determination of the duty to defend between two contracting parties as follows:

**Florida precedent distinguishes between two duties in the contractual indemnification context: (1) the duty to indemnify and hold harmless the indemnitee and (2) the duty to defend the indemnitee.** See *Southern Bell*, 635 So.2d at 78 (noting that the "duty to defend is entirely separate from [the] right to indemnification"). *J.A. Jones*, 232 So.2d at 450 (same). The duty to defend is triggered based on "the nature of the claim" alleged against the indemnitee, "regardless of whether the party asserting the claim should win or lose upon the final determination of the suit". *J.A. Jones*, 232 So.2d at 450; *see also Southern Bell*, 635 So.2d at 78. The indemnitor must defend the indemnitee if the underlying facts contained in the Complaint can be fairly read to support a claim covered by the indemnification provision. *Metropolitan Dade County v. CBM Indus. Of Minnesota, Inc.*, 776 So.2d 937, 938 (Fla.Dist.Ct.App. 2001).

(Id. at 1261).

3. Contracts providing indemnification for one's own negligence are strongly disfavored in Florida and will only be enforced if they express in clear and unequivocal terms an intent to indemnify against the indemnitee's own wrongful acts. *Univ. Plaza Shopping Ctr v. Stewart*, 272 So.2d 507 (Fla. 1973). GAFFIN never expressly agrees in the Purchase Order to defend PCS or to indemnify PCS for its own negligence. To the contrary, GAFFIN agreed to indemnify PCS *except for* PCS's sole negligence. Not only does that provision fall short of the requirement that an agreement purporting to indemnify another for their negligence to do so clearly and unequivocally, the only negligence that Williams is alleging against PCS is PCS's sole negligence, which is expressly *excluded* from the indemnification agreement, because no vicarious liability is alleged. Thus, a comparison of the allegations against PCS to GAFFIN's obligations set forth by the Purchase Order unequivocally shows that GAFFIN had no duty to

defend PCS in the underlying action.

## **GAFFIN COMPLIED WITH THE INSURANCE REQUIREMENTS OF THE PURCHASE ORDER**

Mark Gaffin is the President of Gaffin Industrial Services, Inc. and is the person responsible for procuring insurance coverage for the work that GAFFIN performs. *(See Ex. H, Declaration of Mark Gaffin, ¶ 3)*. According to Mr. Gaffin, Gaffin Industrial Services, Inc. has had an insurance relationship with Lassiter Ware since at least 2002. *(See Ex. K-1, Mark Gaffin Deposition (07/18/12), at 8, lines 20-24)*. Throughout the time of GAFFIN's dealings with Lassiter Ware, their point of contact was Kirk Bramlett with whom he dealt in 2007. Lassiter Ware provided all of the insurance programs for Gaffin Industrial Services, Inc. *(See Ex. K-1, Mark Gaffin Deposition (07/18/12), at 9, lines 5-14)*.

Mr. Gaffin is personally aware of the insurance requirements that PCS had imposed on GAFFIN associated with the work at the White Springs plant. *(See Ex. K-1, Mark Gaffin Deposition (07/18/12), at 9, lines 19-25; at 10, lines 1-4; Ex. H, Declaration of Mark Gaffin, ¶ 4)*. It was Mr. Gaffin's and Gaffin Industrial Services, Inc.'s plan to satisfy those requirements through Lassiter Ware. *(See Ex. K-1, Mark Gaffin Deposition (07/18/12) at 10, lines 5-7)*. It was Mr. Gaffin's intention to fully comply with the insurance requirements set forth in the PCS contract and that these issues were addressed with a Certificate from Lassiter Ware. *(See Ex. K-1, Mark Gaffin Deposition (07/18/12, at 13, lines 6-25; at 14, lines 1-19; Ex. H, Declaration of Mark Gaffin, ¶ 5)*. According to Mr. Gaffin, he understood and sought to obtain the appropriate insurance coverage including the naming of White Springs' as an additional insured so that they would essentially have the same coverage which GAFFIN had under their own policy, specifically Four Million Dollars ($4,000,000.00). *(See Ex. K-1, Mark Gaffin Deposition*

*(07/18/12) at 15, lines 4-20).*

Ecker Brokerage & Associates is a surplus lines insurance broker which essentially acts as a middle man between the retail insurance agent [Lassiter Ware] and the insurance company [American Specialty Insurance Company], providing general liability and excess coverages. *(See Ex. M, Neal Ecker Deposition, at 7, lines 1-25).* Ecker Brokerage & Associates and American Specialty Insurance Company provided an excess general liability policy to Gaffin Industrial Services, Inc. through Lassiter Ware. *(See Ex. M, Neal Ecker Deposition, at 10, lines 6-25; at 11, lines 1-25).*

Mr. Ecker is familiar with the concept of an "insured contract" in an insurance policy and that a company such as GAFFIN may have a duty under a contract with a customer to provide insurance. *(See Ex. M, Neal Ecker Deposition, at 33, lines 3-21; at 34, lines 2-10).* According to Mr. Ecker, the language of the excess policy would follow the form of the underlying policy, meaning that their provisions should be the same in verbiage. *(See Ex. M, Neal Ecker Deposition, at 67, lines 1-25; at 66 1-3).*

However, Mr. Ecker was unaware that any changes in the "insured contract" language in the excess policy from the underlying policy issues by American Safety Risk Retention Group or the prior excess policy issued by FCCI. *(See Ex. M, Neal Ecker Deposition, at 35, line 23-25, at 36, lines 1-3; at 69, lines 22-25).* On the other hand, GAFFIN and Lassiter Ware were provided with a confirmation of coverage which included the endorsement for an "insured contract" but provided GAFFIN and Lassiter Ware with no means to know the contents of the endorsements prior to the subject loss. *(See Ex. M, Neal Ecker Deposition, at 50, line 25, at 51, lines 1-25).* In fact, the policy was not issued and sent to Lassiter Ware until July 25, 2000, long after the subject accident. *(See Ex. M, Neal Ecker Deposition, at 54, lines 10-21; at 58, lines 15-24).* The subject loss occurred even before GAFFIN would have actually received the excess policy. *(See Ex. N, Kirk Bramlett Deposition, at 58, lines 3-14; see also Ex. H, Declaration of Mark Gaffin, ¶*

*6).* As this was a new policy, GAFFIN would not have even had an old policy to look at in order to ascertain any difference in the language. *(See Ex. N, Kirk Bramlett Deposition, at 58, lines 12-14).* In reality, there was no way for GAFFIN to know the terms of their excess policy during the sixty (60) day period for issuance during which time the subject loss occurred. *(See Ex. N, Kirk Bramlett Deposition, at 58, lines 24-25; at 59, line 1; see also Ex. H, Declaration of Mark Gaffin, ¶ 7).*

As a practical matter, however, at the request of GAFFIN, PCS was provided more than the amount of liability coverage PCS required in that GAFFIN's policies afforded Six Million Dollars ($6,000,000.00) when only Four Million Dollars ($4,000,000.00) was requested. *(See Ex. N, Kirk Bramlett Deposition, at 64, line 25; at 65, lines 1-7).* Accordingly, GAFFIN did everything reasonable and necessary on its end to comply with the terms of the Purchase Order and did, in fact, provide PCS with Six Million Dollars ($6,000,000.00) in general liability coverage.

Additionally, PCS received a Certificate of Insurance showing that GAFFIN obtained insurance coverage under GAFFIN's Insurance Policies *(Ex. D-2; collectively; see also Ex. N, Kirk Bramlett Deposition, at 30).* The Certificate of Insurance was issued by Lassiter Ware Insurance, GAFFIN's insurance agent and a duly authorized representative of ASRRG and ASIC. *(Ex. N; Kirk Bramlett Deposition, at 19-20; at 30-31).* The Certificate of Insurance specifically provided that PCS is an additional insured with respect to "General Liability... as required by written contract." *(Ex. D-2).* After receiving a copy of the Certificate of Insurance, PCS signed an Insurance Limits Waiver, accepting as adequate PCS's current coverage as shown in the Certificate of Insurance *(Ex. D-2).* The Insurance Limits Waiver specifically references that an Additional Insured provision is included in GAFFIN's coverage. *(Ex. D-3).*

Throughout the course of his dealings with Lassiter Ware and PCS, it was Mr. Gaffin's intention to provide PCS with what they required. He acted consistently with his intentions. He

11

relied upon Lassiter Ware's experience and expertise in issuing the Certificates and relied upon Lassiter Ware and PCS to make sure that the coverages that were provided were correct. *(See Ex. K-1, Mark Gaffin (07/18/12), at 22, lines 5-25; at 23, lines 1-18).*

## CONCLUSION

Based upon the record evidence before this Court, GAFFIN has no duty or obligation to defend PCS from the allegations of the underlying Complaint in the Williams case. Notwithstanding that the facts do not create a duty for GAFFIN to defend PCS, GAFFIN satisfied and, in fact, exceeded the insurance requirements imposed by PCS. Accordingly, the evidence does not support the claims of PCS and PCS is not entitled to judgment as a matter of law. Rather, the record evidence supports a finding in favor of GAFFIN. As such, GAFFIN requests this Honorable Court to grant summary judgment in its favor.

ERACLIDES, GELMAN, HALL INDEK & GOODMAN, P.A.

FRANK H. COLE, JR., ESQUIRE
Florida Bar No.: 558249
4811 Atlantic Boulevard, 2nd Floor
Jacksonville, Florida 32207
fcole@eglawjax.com
epittman@eglawjax.com
Telephone: (904) 306-9955
Facsimile: (904) 306-9951
*Attorneys for Defendant, Gaffin Industrial Services*

12

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this \_\_19\_\_ day of June, 2013 I provided the foregoing to:

Alfred B. Adams, III, Esquire
al.adams@hklaw.com

Timothy J. Conner, Esquire
timonthy.conner@hklw.com

Melanie B. Chapman, Esquire
chapman@litchfieldcavo.com

John R. Catizone, Esquire
catizone@litchfieldcavo.com

      **ERACLIDES, GELMAN, HALL**
      **INDEK & GOODMAN, P.A.**


      */s/ Frank H. Cole, Jr. Esquire*
      **FRANK H. COLE, JR., ESQUIRE**
      Florida Bar No.: 558249