**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

WHITE SPRINGS AGRICULTURAL
CHEMICALS, INC. d/b/a PCS
PHOSPHATE - WHITE SPRINGS,

      Plaintiff,

v.                                    Case No. 3:11-cv-998-J-32JRK

GAFFIN INDUSTRIAL SERVICES, INC.,
AMERICAN SAFETY RISK RETENTION
GROUP, INC., and AMERICAN SAFETY
INDEMNITY COMPANY.

      Defendants.

_____

## ORDER

This case is before the Court on White Springs Agricultural Chemicals, Inc's ("PCS") Motion for Summary Judgment As To Defendant Gaffin Industrial Services, Inc. ("Gaffin") (Doc. 51), to which Gaffin responded and cross moved for summary judgment (Doc. 75). PCS has replied (Doc. 78). The Court considers the parties' briefs and accompanying exhibits (Docs. 53-72).

## I.    BACKGROUND

### A.    The Williams Lawsuit

This case arises out of a separate wrongful death lawsuit against Gaffin Industrial Services, Inc. ("Gaffin"), JetStream of Houston, LLP ("JetStream"), and PCS for the death of Robert Williams (referred to here as the "Williams lawsuit"). His widow Lisa Williams first filed a wrongful death lawsuit as personal representative of his estate in the Circuit Court of Hillsborough County, Florida on June 5, 2009,

naming PCS, Gaffin, and JetStream as defendants.  (Doc. 53, Ex. V.)  PCS and JetStream removed the case to this Court.  (Williams v. Gaffin Industrial Services, Inc., et al., 3:09-cv-1103-J-32JRK, Doc. 1.)  The Court remanded the case back to state court based on the joinder of Gaffin, a non-diverse defendant.  (Williams, 3:09-cv-1103-J-32JRK, Doc. 67.)  The state court then dismissed the claims against Gaffin, and PCS and JetStream removed the case again.  (Williams, 3:10-cv-549-J-32JRK, Doc. 1).  Lisa Williams eventually settled her claims with Gaffin, JetStream, and PCS.  (See Williams, 3:10-cv-549-J-32JRK, Docs. 113, 161.)

The final operative complaint in the Williams lawsuit was the Second Amended Complaint.  (Doc. 53, Ex. W.)  The complaint alleged that, in June 2007, Williams, an employee of Gaffin, died while using a high-powered waterblasting gun to perform industrial waterblasting work at PCS's White Springs, Florida facility.  (Doc. 53, Ex. W at ¶¶ 2, 6, 28.)  Williams was allegedly performing this work under an agreement between PCS and Gaffin in which Gaffin agreed to provide equipment, including the high-powered waterblasting gun, and personnel to perform work at PCS's facility.  (Id., ¶¶ 8, 11.)  The high-powered waterblasting gun Williams was operating was allegedly "owned and maintained by Gaffin" and "had been improperly modified/altered by Gaffin" to shorten the barrel below the minimum required length and to remove or render inoperable the "dead man control/catch on the trigger."  (Id., ¶¶ 12-14, 28.)  The complaint alleged that the gun was more dangerous as a result of these modifications, which modification ultimately led to Williams' death.  (Id., ¶¶ 15, 28.)  According to the complaint, Williams lost control of the waterblasting gun while cleaning inside a

2

barometric seal tank, but the gun continued to emit a stream that lacerated his leg in several places and severed his femoral artery, which led to his death. (Id., ¶ 28.) The complaint alleged that PCS was directly negligent in failing to maintain its premises and failing to provide Williams with proper protective personal equipment, a safe waterblasting gun, and proper lighting. (Id., ¶ 35.) The complaint also alleged that PCS was strictly liable for the "ultrahazardous" and "inherently dangerous" activity Williams was performing for Gaffin. (Id., ¶¶ 37-43.) Although Gaffin was not a defendant in the Second Amended Complaint, this claim for strict liability against PCS included the allegation that Williams' accident occurred "[a]s a direct and proximate result of PCS Phosphate's wrongdoing and/or the wrongdoing of Gaffin." (Id., ¶ 43.)

## B.    The PCS v. Gaffin, ASSRG, ASIC Lawsuit

PCS tendered defense of the Williams lawsuit to Gaffin and its insurers, American Safety Indemnity Company ("ASIC") and American Safety Risk Retention Group, Inc. ("ASRRG"). (Doc. 53, Ex. Y, Doc. 65, Ex. X.) PCS demanded a defense and indemnity from Gaffin's insurers as an additional insured under Gaffin's insurance policies. (Doc. 65, Ex. X.) ASIC and ASRRG denied that the policies cover PCS as an additional insured and declined to offer a defense. (Doc. 53, Ex. Y, Doc. 65, Ex. X.) Gaffin likewise refused to indemnify PCS. PCS filed this action against Gaffin seeking indemnification and alleging breach of contract for Gaffin's failure to obtain adequate insurance coverage and failure to provide indemnity to PCS in the Williams lawsuit.[1]

---

[1] PCS also brings claims against Gaffin's insurer's, ASIC and ASRRG, for breach of contract and declaratory relief. (Doc. 1.) Those claims are the subject of a separate order filed contemporaneously herewith. (Doc. 86.) Gaffin cross-claimed

(Doc. 1, Counts I and II.)   As noted above, PCS settled with the plaintiff in the Williams lawsuit and paid a sum of money.  (See Docs. 31, 32.)  Gaffin and its insurers contributed to the settlement payment.  (Williams, 3:10-cv-549-J-32JRK, Doc. 152 at 3 n.2.)  Pursuant to a partial settlement with the other parties in this case, PCS is no longer seeking to recover the settlement money it paid to the plaintiff in Williams. (Doc. 51 at 17.)  PCS seeks only to recover its reasonable attorney's fees and litigation expenses in defending the Williams lawsuit.  (Id.)  PCS's claims against Gaffin are based on its contention that the indemnification clause in a purchase order PCS issued to Gaffin requires Gaffin to indemnify and hold PCS harmless for any bodily injury, including death, connected to Gaffin's work for PCS, unless the bodily injury or death results from the "sole negligence or willful misconduct" of PCS.  (Doc. 51 at 13.)

### C.   The Purchase Order

PCS is in the business of mining phosphate and producing phosphoric acid and operates a phosphoric acid plant in White Springs, Florida.  (Doc. 53, Ex. A  at 7-8.) Gaffin uses waterblasting equipment to high pressure clean industrial facilities like the White Springs plant. (Id., Ex. B at 106-07.)  PCS hired Gaffin as a waterblasting contractor to perform industrial waterblasting services at its White Springs facility in June 2007.  (Id., Ex. C at ¶ 7, Ex. D at 61; Doc. 65, Ex. C-1.)  PCS issued to Gaffin Purchase Order No. 50125964 ("Purchase Order"), dated June 5, 2007, for Gaffin to "HIGH PRESSURE CLEAN FILTERS, REACTORS, PIPELINES AND ASSOCIATED EQUIPMENT FOR SRC TURNAROUND." (Doc. 65, Ex. C-1; Doc. 53, Ex. C at ¶ 8, Ex.

---

against ASRRG and ASIC for breach of contract and declaratory relief.  (Doc. 17.)

D at 61.)  Pursuant to the Purchase Order, Gaffin was to "supply all labor, materials, equipment, tools, supervision, insurance, and all items of expense necessary to safely perform the 'work.'"  (Doc. 65, Ex. C-1.)  Gaffin was responsible to ensure that its employees complied with all safety rules and regulations, and "to exert primary controls . . . to obtain desired performance from [its] employees." (Id. at 14.)  Paragraph 7 of the General Terms and Conditions of the Purchase Order required Gaffin to obtain insurance coverage prior to commencement of any work, including "[c]ommercial general liability insurance with a combined bodily/personal injury and property damages limit of US $4,000,000 for each occurrence" and "[b]lanket contractual liability insurance sufficiently broad to include paragraph 8 "INDEMNIFICATION." (Doc. 65-1 at 9 ¶ 7.)  Paragraph 7 also required that PCS "must be named additional insured" on the commercial liability policy and that Gaffin must provide PCS with certificates of insurance evidencing the required coverage prior to beginning the work. (Id.)

Paragraph 8 of the General Terms and Conditions of the Purchase Order on "INDEMNIFICATION" includes the following language:

> CONTRACTOR SHALL INDEMNIFY AND HOLD HARMLESS OWNER, ITS AFFILIATES, EMPLOYEES AND AGENTS AGAINST ALL CLAIMS, LIABILITIES, LOSSES, DAMAGES AND EXPENSES (OF EVERY CHARACTER WHATSOEVER) FOR BODILY INJURY, SICKNESS, DISEASE, AND/ OR DEATH . . . SUSTAINED BY ANY PERSON (INCLUDING BUT NOT LIMITED TO EMPLOYEES OF OWNER, CONTRACTOR OR ANY SUBCONTRACTOR) IF SUCH INJURY, SICKNESS, DISEASE, AND/ OR DEATH ... IS IN ANY WAY CONNECTED WITH THE WORK, OR WITH THE PERFORMANCE OR FAILURE TO PERFORM THE WORK, AND UNLESS IT RESULTS FROM THE SOLE NEGLIGENCE OR WILLFUL MISCONDUCT OF

5

OWNER.

(Doc. 65, Ex. C-1 at 9 ¶ 8.)  This Indemnification Clause also includes a "Notice Required By Texas Express Negligence Rule" stating:

> CONTRACTOR ACKNOWLEDGES THAT ITS LIABILITY AND INDEMNITY OBLIGATIONS UNDER THIS PARAGRAPH SHALL BE WITHOUT REGARD TO THE NEGLIGENCE OF OWNER, WHEN OWNER'S NEGLIGENCE IS A JOINT, CONCURRENT, OR PARTIAL (BUT NOT SOLE) CAUSE OF THE INCIDENT, OCCURRENCE OR RESULTING LOSS, DAMAGE, DESTRUCTION, INJURY, SICKNESS, DISEASE OR DEATH, AND WITHOUT MONETARY LIMIT TO THE EXTENT PERMITTED BY LAW.

(Id.)

### D.   Gaffin's Insurance Policies

Prior to commencing work, Gaffin purchased a commercial general liability insurance policy from ASRRG, Policy No. 016484-07-01 ("CGL Policy") with policy limits of $1,000,000 (Doc. 53 Ex. F, Ex. G at 10-14) and an excess/umbrella liability policy from ASIC Policy No. ESU01644-07-01 ("Excess Policy") with policy limits of $5,000,000 (Doc. 53, Ex. G at 14-16) (collectively referred to here as "Gaffin's Insurance Policies").  Lassiter-Ware Insurance, Gaffin's insurance agent, issued a Certificate of Insurance indicating that Gaffin had obtained a commercial general liability insurance policy.  (Doc. 53, Ex. I.)  The Certificate of Insurance listed PCS as an "Additional Insured with respects to General Liability and Automobile Liability as required by written contract."  (Id.)  PCS received this Certificate of Insurance and thereafter signed an Insurance Limits Waiver indicating acceptance of Gaffin's coverage and stating that an additional insured provision had been provided.  (Doc. 53, Ex. C at ¶

10, Ex. C-3.)  However, after Robert Williams died, ASRRG and ASIC denied that PCS was covered as an additional insured and refused to defend or indemnify it in the Williams lawsuit.

### E.    Gaffin's Work At PCS's White Springs Facility[2]

Williams's accident occurred during the night shift that began in the evening of June 10, 2007 and lasted into the morning of June 11, 2007.  (Doc. 53, Ex. B at 16-24.) That night, Gaffin's employees were performing work at multiple locations at the facility, and other contractors were working on site. (Doc. 53, Ex. J at ¶ 4, Ex. K at 8.) On the day of the accident, PCS gave Gaffin a list of vessels that needed cleaning. (Doc. 53, Ex. K at 20- 21.)  According to Mark Alvarez, the lead Gaffin supervisor on the night of the accident, the timing, scheduling, manner, and method of cleaning the vessels was up to Gaffin.  (Id.)  Gaffin assigned a crew that included Williams, Gerald Duffy, and Fred Carter to clean the inside of the Barometric Condenser Seal Tank, also known as the "Flash Cooler" or the "Hot Well Tank." (Doc. 53, Ex. K at 20-21; see also Doc. 53, Ex. L.)  Williams was an experienced waterblaster who had worked for Gaffin since 2003. (Doc. 53, Ex. A at 37-38, Ex. B at 50-54, Ex. D at 122.)

### 1.    Gaffin Did Not Use 3D Waterblasting

The Purchase Order did not specify or direct what method of waterblasting Gaffin should use on the Hot Well Tank or any other facility.  But it did specify that Gaffin would provide all equipment, which would include all waterblasting equipment

---

[2]  Gaffin's response does not dispute any of the following facts and actually repeats verbatim some of the statements in the "Statement of Undisputed Facts" in PCS's motion.  (Compare Doc. 51 at 3-7, 12-13 with Doc. 75 at 2-4, 5-7.)

and personal protective equipment.  (Doc. 65, Ex. C-1.)  According to Mark Gaffin and Dan McCleary, co-owners of Gaffin, and to Alvarez, Gaffin was aware of 3D waterblasting technology and owned a 3D system called the "Hurricane" system that would allow an operator to lower a nozzle into a confined space from the top, without entering the tanks, with high pressure streams spraying in every direction.  (Doc. 53, Ex. D at 63-65, Ex. A at 39-40, Ex. K at 12, 14.)  According to Mark Gaffin, it was Gaffin's decision, not PCS's, whether to use 3D waterblasting technology on a particular job.  (Doc. 53, Ex. D at 65; Doc. 57-1 at 351-52.)  In particular, the supervisors on the job – in this case Duffy or Alvarez – would make the decision whether to use 3D water blasting as opposed to manual.  (Doc. 53, Ex. D at 70.)  Gaffin did not use 3D technology to clean the Hot Well Tank on the night of the accident, but instead used manual waterblasting equipment with a man inside the tank.  (Doc. 53, Ex. K at 18-19.)

## 2. Gaffin Had Modified the Waterblasting Gun

Gaffin supplied all equipment for the job, including the waterblasting gun, lighting, and personal protective equipment used by Williams. (Doc. 53, Ex. B at 156-157.)  The gun Williams used to clean the inside of the Hot Well Tank was a yellow-handled gun manufactured by JetStream. (Doc. 53, Ex. K at 52-53, Ex. B at 45, Ex. M at 19-25.)  Directly on the yellow handle were the warnings: "DANGER DO NOT SHORTEN BARREL MIN 48 INCH FRONT BARREL LENGTH;" and "DANGER USE MINIMUM 48 INCH FRONT AND 14 INCH REAR BARREL."  (Doc. 53, Ex. Q.) According to Gaffin's employees, this warning was apparent on the gun's handle, and

Gaffin employees were aware of the warnings. (Doc. 53, Ex. B at 97-98, Ex. K at 144-45.) Gaffin also received literature with each waterblasting gun from JetStream, which said, in pertinent part: "WARNING: A 48" long discharge barrel MUST be used on handheld control guns to prevent nozzle discharge from accidentally striking the operator's feet, legs or body.  DO NOT USE A HANDHELD CONTROL GUN IF ITS NOZZLE DISCHARGE CAN ACCIDENTLY STRIKE OPERATOR'S BODY." (Doc. 53, Ex. P, Ex. N at 39, Ex. A at 106-07.)  McCleary, who was in charge of operations at Gaffin, admitted that, before the accident, Gaffin knew of the warnings not to shorten the gun. (Doc. 53, Ex. A at 106-07, Ex. D at 8.)  In spite of these warnings, Gaffin shortened the front barrel of the yellow-handled waterblasting gun to approximately 28 inches. (Doc. 53, Ex. A at 86-87, Ex. Q.)  According to Mark Gaffin, it was not his decision to shorten the barrels for a particular job, but he knew it had occurred. (Doc. 53, Ex. D at 84.)  There is no evidence that PCS knew before the accident that Gaffin had shortened the barrels of its waterblasting guns. (Doc. 53, Ex. A at 68, Ex. K at 57, 60, Ex. J at ¶ 13.)

At their depositions, JetStream employees demonstrated the method JetStream recommends for using its waterblasting guns with full-length, unshortened barrels. (See Doc. 53, Ex. N at 66-70, Ex. O at 20-25, Ex. R.)  The gun depicted in the video at Exhibit R is the same model that Williams was using, in the condition it would have been shipped to Gaffin.  (Id.)  As demonstrated in the video, the manufacturer's recommended barrel length provides a geometric protection from the risk of injury from the waterblasting gun's stream. (See Doc. 53, Ex. R., see also Ex. S, Ex. S-1.)  That is,

9

at the recommended length, it would be impossible for a person of Williams' height to aim the gun at his lower extremities while operating it. (Doc. 53, Ex. S-1.)  But the shortening of the barrel made it possible for Williams to shoot himself in the leg.  (Id.)  Since the accident, Gaffin no longer shortens the barrels of waterblasting guns.  (Doc. 59 at 127-28.)  Before the accident, Gaffin had made other modifications to the barrel that increased the thrust of the yellow-handled waterblasting gun.  (Doc. 53, Ex. S-1.)  Dr. David Summers, a waterblasting expert, personally examined the waterblasting gun and determined that the gun as used by Williams would have caused a back thrust of 93.5 lbs.  (Id.)  Industry standards call for a maximum thrust of one-third the body weight of the user.  (Id.; Doc. 53, Ex. R)  For a person of Williams' weight, the maximum back-thrust should have been approximately 72 lbs.  (Id.)

### H.   The Accident

Williams began waterblasting the north side of the Hot Well Tank at around 9:00 P.M. (Doc. 53, Ex. B at 17-18.)  He finished descaling the north side of the tank, took a break, and then started cleaning the south side of the tank.  (Id.)  Shortly after midnight, Williams was working inside the tank, when Duffy and Carter heard a yell from inside of the tank. (Id. at 22-23.)  Williams crawled out of the tank and said, "I hit my damn leg . . . the damn gun got stuck."  (Id. at 24.)  Bristol and Alvarez arrived on the scene as Williams was crawling out of the tank, and attempted to administer first aid. (Doc. 53, Ex. K at 27, Ex. J at ¶ 12.)  The stream from the waterblasting gun, operating at an estimated 9,500 psi, struck Williams' right inner thigh, just above the knee, severing his femoral artery and causing him to lose massive amounts of blood.

10

(Ex. T.)  He lost consciousness within minutes after crawling out of the tank and died before reaching the hospital.  (Id.; Doc. 53, Ex. K at 29.)  The cause of death listed on the Autopsy Report is hypovolemic shock. (Ex. T.)

OSHA started investigating the accident the same day.  (See Doc. 53, Ex. U at 3.)  OSHA found that Gaffin violated OSHA regulations by shortening the barrel of the waterblasting gun, a hazard which caused or was "likely to cause death or serious physical harm" to Gaffin's employees, and issued a "Willful" citation to Gaffin on December 4, 2007.  (See Doc. 53, Ex. D at 102-03; Ex. U.)  OSHA changed the violation type from "Willful" to "Serious" as part of a settlement agreement with Gaffin.  (Id.)

## II.   STANDARD OF REVIEW

Summary judgment is proper "when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1314 (11th Cir. 2011); Fed. R. Civ. P. 56(a), (c).  The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  Although all facts and reasonable inferences must be viewed in the light most favorable to the nonmoving party, Ramos-Barrientos v. Bland, 661 F.3d 587, 594 (11th Cir. 2011), "the nonmoving party cannot create a genuine issue of material fact through speculation, conjecture, or evidence that is 'merely colorable' or 'not significantly probative.'" Vega v. Invsco Grp., Ltd., 432 F.

App'x 867, 869-70 (11th Cir. 2011) (quoting Anderson, 477 U.S. at 249-50).  "When the only question a court must decide is a question of law, summary judgment may be granted."  Saregama India Ltd. v. Mosley, 635 F.3d 1284, 1290 (11th Cir. 2011). Contract Interpretation, including whether it is ambiguous, is a question of law.  Id.

"Cross motions for summary judgment do not change the standard." Perez-Santiago v. Volusia Cnty., No. 6:08-cv-1868-Orl-28KRS, 2010 WL 917872, at *2 (M.D. Fla. Mar. 11, 2010) (quoting Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007)) (internal quotation marks omitted).  "Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."  Perez-Santiago, 2010 WL 917872 at *2 (citations and internal quotations omitted). When considering cross-motions for summary judgment, the Court must "consider and rule upon each party's motion separately and determine whether summary judgment is appropriate as to each under the Rule 56 standard."  Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co., 176 F.3d 794, 797 (4th Cir. 1999) (citations omitted).

## III.   DISCUSSION

### A.   Gaffin's Duty to Indemnify PCS for the Williams Lawsuit

PCS contends that its agreement with Gaffin requires Gaffin to indemnify and hold PCS harmless for any bodily injury, including death, connected to Gaffin's work for PCS, unless the bodily injury or death results from the "sole negligence or willful misconduct" of PCS.  (Doc. 51 at 13.)  PCS argues that it is undisputed, based on the allegations in the Williams lawsuit and the facts developed in discovery, that Williams'

12

death did not result from PCS's sole negligence or willful misconduct, but, at most, as the result of joint negligence.  (Id. at 14.)

Gaffin does not dispute that pursuant to the Purchase Order, it agreed to indemnify PCS except for PCS's sole negligence.  (Doc. 75 at 8.)  Nor does Gaffin dispute that Williams' death was "connected" with the performance of Gaffin's work under the contract.  Indeed, Williams' was fatally injured performing the work PCS hired Gaffin to do.  Instead, Gaffin argues that the allegations in the underlying Williams lawsuit were only for PCS's sole negligence, not for any negligence of Gaffin; thus, Gaffin is not obligated to indemnify PCS.  Gaffin contends that the Court should look only at the allegations of the complaint in the Williams lawsuit,[3] and does not attempt to dispute the underlying facts related to Gaffin's actions.  (See id. at 7.)

Contracts that attempt to indemnify a party against its own negligence are disfavored in Florida law.  Charles Poe Masonry v. Spring Lock Scaffolding Rental Equip. Co., 374 So. 2d 487, 489 (Fla.1979).  Thus, "in order for the indemnity contract to be construed as allowing indemnification for the indemnitee's own negligence, that intention must be expressed in clear and unequivocal terms."  Florida Power & Light Co. v. Mid-Valley, Inc., 763 F.2d 1316, 1318 (11th Cir. 1985) (citing Univ. Plaza Shopping Ctr., Inc. v. Stewart, 272 So. 2d 507, 509 (Fla. 1973)).  The language in the Indemnification Clause—"unless it results from the sole negligence"—clearly expresses Gaffin's intent to indemnify PCS for the joint negligence of PCS and Gaffin or PCS and

---

[3] Gaffin bases this contention upon an apparent misunderstanding that PCS seeks to impose a duty to defend, rather than a duty to indemnify.  (Doc. 75 at 7; see Doc. 78 at 2.)

JetStream. <u>United Parcel Serv. of Am., Inc. v. Enforcement Sec. Corp.</u>, 525 So. 2d 424, 426 (Fla. 1st DCA 1987) (holding that the language "except from and against all losses, damages, expense, etc., as set forth hereinabove, arising out of the sole negligence of UPS" sufficiently manifests the lessee's "unequivocal intent" to indemnify the lessor for the joint negligence of the lessor and lessee).  Moreover, the Notice Required By Texas Express Negligence Rule provision of  the Indemnification Clause states that Gaffin's indemnity obligation is "without regard to the negligence of [PCS], when [PCS's] negligence is a joint, concurrent, or partial (but not sole) cause of the incident." (Doc. 65, Ex. C-1 at 9, ¶ 8.)

Under Florida law, "a party seeking indemnification [after a settlement] must establish that the settlement was made based on his potential liability to the plaintiff. A showing of 'potential liability' is required because the indemnitee must not be a mere volunteer who has settled the underlying claim when there was no exposure to legal liability that obligated him or her to do so." <u>Camp, Dresser & McKee, Inc. v. Paul N. Howard Co.</u>, 853 So. 2d 1072, 1079-80 (Fla. 5th DCA 2003); <u>United Rentals, Inc. v. Mid-Continent Cas. Co.</u>, 11-80955-CIV, 2013 WL 1296313, *2 (S.D. Fla. Mar. 26, 2013). A showing of actual liability is only required if the indemnitor is not given notice and an opportunity to assume the defense or responsibility of the underlying plaintiff's claim. <u>Camp, Dresser & McKee, Inc.</u>, 853 So. 2d at 1080.  There is no issue of notice or opportunity to defend here, since Gaffin actually participated in the settlement of the Williams lawsuit by contributing to the settlement amount.  Thus, PCS must only demonstrate that it was potentially liable to the plaintiff in the Williams lawsuit.

14

Courts in Florida look to the actual facts, rather than the allegations in the underlying case, to determine whether a duty to indemnify exists. <u>CSX Transp., Inc. v. Becker Sand & Gravel Co.</u>, 576 So. 2d 902, 904 (Fla. 1st DCA 1991) ("It is the indemnitee's actual wrongdoing or lack of it, rather than the allegations of wrongdoing, which determine the indemnitee's rights.); <u>Am. Home Ins. Co. v. City of Opa-locka</u>, 368 So. 2d 416, 419 (Fla. 3d DCA 1979).

The facts developed through discovery make clear that PCS's potential liability was not based solely on its own alleged negligence, but also some negligence on the part of Gaffin, solely or jointly, that likely caused or contributed to Williams's injury and death and for which PCS could have been liable under Florida law. <u>See</u> <u>Metro. Dade Cnty. v. Fla. Aviation Fueling, Co., Inc.</u>, 578 So. 2d 296, 299 n.4 (Fla. 3d DCA 1991) (<u>rehr'g</u> <u>denied</u> May 1, 1991) (finding vicarious liability claim potentially viable because the indemnitor was arguably engaged in an ultrahazardous activity causally related to the plaintiff's injuries). Gaffin failed to use 3D waterblasting. Gaffin shortened the gun contrary the manufacturer's warnings. Gaffin operated the gun with too high a back thrust. Gaffin does not dispute these facts.[4] Had Gaffin used a 3D gun, Williams would not have been inside the tank. Had Williams been using a gun at the length recommended by the manufacturer, he likely could not have hit his leg with the water blast. Thus, the undisputed evidence establishes that PCS had

---

[4] There is testimony indicating that it may have been more difficult or even impossible to clean the Hot Well Tank with a 48-inch gun, and it is questionable whether a 3D gun could be used on that tank either. (<u>See</u> Doc. 56-1 at 97-105 at Doc. 53, Ex. D at 65-66, Ex. K at 18-19.) Nevertheless, for indemnity to kick in, PCS need only prove its potential liability for some potential negligence by Gaffin.

potential vicarious liability for some of Gaffin's negligence, rather than solely for its own.

Even were the Court to consider only the allegations in the Williams lawsuit, as Gaffin urges, and not the actual facts, at least one count of the Williams complaint still qualifies for coverage under the Indemnification Clause as one not arising solely out of PCS's negligence.  Gaffin may not have been a party by the time the Williams lawsuit reached the Second Amended Complaint, but Count II for strict liability against PCS for ultrahazardous/inherently dangerous activity is based, at least in part, on PCS's alleged vicarious liability for Gaffin's actions.  (Doc. 53, Ex. W, ¶¶ 37-43); see Gyongyosi v. Miller, 80 So. 3d 1070, 1076 (Fla. 4th DCA 2012) ("Florida courts allow for employers to be held vicariously liable for an independent contractor's negligence under the inherently dangerous activities doctrine.") (citing Am. Home Assurance Co. v. Nat'l R.R. Passenger Corp., 908 So. 2d 459, 468 (Fla. 2005)), reh'g denied (Mar. 23, 2012), review denied, 109 So. 3d 780 (Fla. 2013).  Indeed, many of the factual allegations in the complaint were based on the acts or omissions of Gaffin.  (See, e.g., id. at ¶¶ 12-15.) So the allegations in the complaint were not strictly limited to the sole negligence of PCS alone.

Thus, both the allegations of the Second Amended Complaint and the undisputed facts in the Williams lawsuit demonstrate that Williams' injuries did not result from the sole negligence or willful misconduct of PCS and that PCS's potentially liability was also based on Gaffin's actions or inactions.  Therefore, Gaffin is contractually obligated to indemnify and hold harmless PCS for the Williams lawsuit

16

under the terms of the Purchase Order. The Purchase Order includes indemnification for "ALL CLAIMS LIABILITIES, LOSSES, DAMAGES, AND EXPENSES (OF EVERY CHARACTER WHATSOEVER)." (Doc. 65, Ex. C-1 at 9, ¶ 8.) This language includes reasonable attorney's fees and expenses incurred by PCS in defending the Williams lawsuit. See Natco Ltd. P'ship v. Moran Towing of Florida, Inc., 267 F.3d 1190, 1194 (11th Cir. 2001) (finding that the phrase "any and all loss, damage or liability" in an indemnity provision encompasses attorney's fees even though attorney's fees were not specifically mentioned). PCS's motion for summary judgment against Gaffin on Count I of the complaint is due to be granted and Gaffin's cross motion is due to be denied.

### B.   Gaffin's Breach of Contract to Procure Insurance Coverage

PCS also claims that Gaffin breached its contract with PCS by failing to procure insurance coverage that (1) named PCS as an additional insured and (2) was sufficient to cover the Indemnification Clause. (Doc. 51 at 2, 18-20.) Gaffin responds that it intended to, and thought it had, procured a policy that did both. (Doc. 75 at 9-12.)

Paragraph 7 of the General Terms and Conditions of the Purchase Order required that PCS "shall be named additional insured" on the Gaffin's commercial general liability policy. (Doc. 65-1 at 9, ¶ 7.) As discussed in more detail in the Court's separate order on PCS and ASRRG's cross motions for summary judgment, PCS does qualify as an additional insured on Gaffin's insurance policies. (Doc. 86 at 9-10.) Thus, to the extent PCS's motion is based on Gaffin's alleged failure to procure an insurance policy with PCS as an additional insured, the motion is due to be denied.

PCS' motion also briefly contends, without any argument, that Gaffin breached its obligation under paragraph 7 of the General Terms and Conditions to procure a policy that includes "[b]lanket contractual liability insurance sufficiently broad to include" Gaffin's indemnification obligation.  (Doc. 51 at 2, 19-10; see Doc. 65-1 at 9, ¶ 7.)  For the reasons discussed above, Gaffin does owe PCS indemnity for the Williams lawsuit.  However, the Court agrees with PCS that whether Gaffin's insurance policies cover its contractual indemnity obligation is best addressed along with Gaffin's cross-claim against its insurers.  (See Doc. 51 at 2 n.2, 20.)  The Court thus defers for further consideration that portion of PCS's motion seeking summary judgment on Count II based on Gaffin's alleged failure to procure insurance coextensive with its indemnity obligation.[5]

Accordingly, it is hereby

**ORDERED:**

1.    White Springs Agricultural Chemicals, Inc's Motion for Summary Judgment As To Defendant Gaffin Industrial Services, Inc. (Doc. 51) is **GRANTED in part, DENIED in part**, and **DEFERRED in part** to the extent set forth above.

2.    Gaffin Industrial Services, Inc.'s Cross Motion for Summary Judgment (Doc. 75) is **DENIED in part** and **DEFERRED in part** to the extent set forth above.

3.    No later than **March 31, 2014** the parties should file a joint notice

---

[5] By entering this Order, the Court does not prejudge any issue between Gaffin and its insurers regarding insurance coverage.

18

advising the Court how they propose to proceed with the remaining issues in this case, including whether further settlement efforts should now be undertaken.  The Court will not enter final judgment until all issues have been resolved.

      **DONE AND ORDERED** at Jacksonville, Florida, on this 6th day of March, 2014.

TIMOTHY J. CORRIGAN
United States District Judge

bjb.
Copies:

Counsel of Record