**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

WHITE SPRINGS AGRICULTURAL
CHEMICALS, INC. d/b/a PCS
PHOSPHATE – WHITE SPRINGS,

       Plaintiff,

v.                                  Case No. 3:11-cv-998-J-32JRK

GAFFIN INDUSTRIAL SERVICES,
INC., AMERICAN SAFETY RISK
RETENTION GROUP, INC., and
AMERICAN SAFETY INDEMNITY
COMPANY,

       Defendants.

---

**ORDER ON GAFFIN'S MOTION FOR SUMMARY JUDGMENT**

The Court earlier determined on cross-motions for summary judgment that general liability insurer American Safety Risk Retention Group, Inc. ("ASRRG") does not owe White Springs Agricultural Chemicals, Inc. ("PCS") a duty to defend it in an underlying wrongful death lawsuit brought by the estate of an employee of its insured, Gaffin Industrial Services, Inc. ("Gaffin") (Doc. 86), but that Gaffin does owe PCS a duty to pay PCS's attorney's fees and expenses from the lawsuit (Doc. 87). Still left for resolution is whether ASRRG and excess insurer American Safety Indemnity Company ("ASIC") owe Gaffin, as their insured, coverage for its obligation to PCS. That issue is now before the Court.

ASRRG concedes that it owes Gaffin coverage for PCS's fees and expenses up to the remainder of its $1,000,000 policy limits, but contends that the Court should not

enter judgment until PCS substantiates its fees and expenses and identifies which amounts were incurred in defending and eventually settling the underlying lawsuit and which came later. ASIC disputes that it owes any coverage for Gaffin's obligation to PCS, either under the language of the policy or by estoppel.

## I.   BACKGROUND

Many of the details of this case can be found in the Court's earlier orders and will not be repeated here. (See Docs. 86, 87.) The Court will restrict its discussion of the facts here to those relevant to the present inquiry.

This case arises out of a wrongful death lawsuit ("the Williams lawsuit") first filed against Gaffin, PCS, and JetStream of Houston, LLP for the June 11, 2007 death of Robert Williams, an employee of Gaffin. Williams had been waterblasting inside a tank at PCS's facility in White Springs, Florida when the stream from the waterblasting gun hit his right inner thigh, causing massive blood loss and death. (Doc. 87 at 10-11.) Williams had been performing this work pursuant to a Purchase Order between PCS and Gaffin, dated June 5, 2007.[1] (Id. at 4.) The parties eventually settled the Williams lawsuit, with PCS, Gaffin, ASRRG, and ASIC contributing to the settlement. (Id. at 4.)

PCS then sued Gaffin, ASRRG, and ASIC for coverage and indemnity for the Williams lawsuit. (Doc. 1.) Gaffin filed a cross-claim against its insurers contending that, in the event Gaffin is required to indemnify PCS, they must indemnify Gaffin for

---

[1] The key terms of the Purchase Order are found in the Court's previous order. (See Doc. 87 at 4-6.)

any amounts paid to PCS. (Doc. 19.) In one of its earlier orders, the Court determined that the Purchase Order contractually obligated Gaffin to indemnify and hold PCS harmless for the Williams lawsuit, including for PCS's reasonable attorney's fees and expenses. (Doc. 87.) Gaffin has now moved for summary judgment on its cross-claim against the insurers. (Doc. 91.) PCS filed a brief in support.[2] (Doc. 90.) ASRRG and ASIC filed separate responses. (Docs. 96, 97.) With the Court's permission, Gaffin and PCS filed a joint reply brief. (Doc. 102.) The Court draws the following facts largely from the unchallenged statement of facts in Gaffin's motions, though the Court has independently reviewed the underlying evidence.[3]

The terms and conditions of the Purchase Order required Gaffin to carry insurance coverage "sufficiently broad to include" its indemnification obligations in the agreement in the amount of at least $4,000,000 per occurrence. (Doc. 65 at 9, ¶ 7.) Gaffin had used Lassiter-Ware Insurance, Inc. as its insurance broker for all its insurance programs since at least 2002. (Doc. 62 at 8-9; Doc. 63 at 8-9.) From 2004 until May 25, 2007, Lassiter-Ware procured Gaffin's general liability and excess coverage from FCCI Commercial Insurance Company. (Doc. 63 at 63-64; Doc. 92-5 at 8-11.) In May 2007, the FCCI policies had been set to renew for 2007-2008. (Doc. 92-5 at 12-15, 20-22.) But, possibly to find additional pollution coverage, Lassiter-Ware

---

[2] PCS's brief is nearly identical to Gaffin's motion, including its statement of facts. For ease of reference, the Court will refer only to Gaffin and its motion, unless otherwise necessary.

[3] ASIC and ASRRG do not contest the factual allegations in Gaffin's motion for summary judgment, beyond occasionally disclaiming personal knowledge or asserting that a document "speaks for itself." (See Docs. 96, 97.)

instead procured for Gaffin a new commercial general liability insurance policy from ASRRG, Policy No. 016484-07-01 ("CGL Policy"), effective May 25, 2007 through May 25, 2008, with policy limits of $1,000,000 (Doc. 53-10; Doc. 64 at 10-11), and a new excess liability policy from ASIC, Policy No. ESU01644-07-01 ("Excess Policy"), with policy limits of $5,000,000 (Doc. 92-1; Doc. 64 at 14-15).[4]

The CGL Policy and the Excess Policy both generally exclude from coverage claims for "bodily injury" or "property damage" arising from Gaffin's "assumption of liability under a contract or agreement." (Doc. 53-10 at 2; Doc. 92-1 at 2.) But both policies also except from this exclusion liability assumed in an "insured contract," though they include different definitions of the term. (Doc. 53-10 at 2; Doc. 92-1 at 2.) Section V.9 of the CGL policy defines "insured contract" to include:

> f.   That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

(Doc. 53-10 at 12.) The CGL also provides that:

> Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:
>
> (a)   Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract": and
>
> (b)   Such attorney fees and litigation expenses are for defense of that

---

[4] In the first of its orders on the parties' initial cross-motions for summary judgment, the Court held that the CGL Policy did not provide coverage directly to PCS for the Williams lawsuit. (Doc. 86.)

party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

(Id. at 2.)

The definition of "insured contract" in Section V.19 of the Excess Policy starts out similarly to the definition in the CGL Policy, but adds a clause at the end of its general definition that is not present in the CGL Policy's definition. Under the Excess Policy, an insured contract is:

a.  That part of any written contract or written agreement under which you assume the tort liability of another party to pay damages not otherwise excluded under the policy because of 'bodily injury' or 'property damage' to a third party ***and caused by your negligence***.

(Doc. 92-1 at 12 (emphasis added).) The Excess Policy then includes an exclusion from the definition of insured contract also not in the CGL Policy:

b.  An "insured contract" does not include that part of any contract or agreement:

. . .

(3)  Under which the insured agrees to indemnify, hold harmless, defend, make contribution to or share damages with a third party for "claims" or "suits" directly or indirectly "arising from" that third party's negligence, actions, inactions or status, including (without limitation) for vicarious liability, derivative liability, strict liability or liability without fault . . . .

(Id.)

Lassiter-Ware obtained the Excess Policy for Gaffin from surplus lines insurance broker Ecker Brokerage & Associates, Inc. (Doc. 75-17 at 7.) In the insurance industry, the language of an excess policy can follow the form of the underlying policy, but may not where the excess insurer includes additional exclusions

outlined in its own policy. (Id. at 10, 61-63, 67; see Doc. 63 at 55-57.) Neal Ecker, principal of Ecker Brokerage, was unaware at the time the Excess Policy issued whether it defined "insured contract" differently than the CGL Policy. (Doc. 75-17 at 35-36, 69.) The CGL Policy, the prior policies issued by FCCI, and the insurance industry standard forms all use similar language for coverage of an "insured contract." (See Doc. 92-5 at 32-33.) The policy forms used in the Excess Policy were different and of ASIC's creation. (Doc. 63 at 60.)

On May 25, 2007, Ecker Brokerage delivered a Confirmation of Coverage for the Excess Policy to Lassiter-Ware, and the policy took effect the same day. (Doc. 92-4; see Doc. 63 at 30-31.) The Confirmation of Coverage includes a list of ASIC-proprietary "coverage forms and endorsements" that apply to the binder. (Doc. 92-4 at 4; see Doc. 63 at 60.) The list includes form "XS 04 01 04 04" which is the form containing ASIC's coverage obligation, including the definition of "insured contract." (Doc. 92-4 at 4.) The Confirmation of Coverage makes no specific mention of exclusions relating to "insured contract" coverage. (See id.)

Neither Gaffin nor its insurance brokers at Lassiter-Ware received a copy of the CGL Policy or the Excess Policy until July 25, 2007, well after the accident at issue in this case. (Doc. 92-2, ¶ 6; Doc. 75-17 at 54, 58; Doc. 75-18 at 58-59; see Doc. 63 at 58-59.) According to Mark Gaffin, president of the company, he would not have purchased the Excess Policy had he known it might not fully cover Gaffin's indemnity obligations to PCS. (Doc. 92-2, ¶ 9.)

## II.    STANDARD OF REVIEW

Summary judgment is proper "when the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." <u>Josendis v. Wall to Wall Residence Repairs, Inc.</u>, 662 F.3d 1292, 1314 (11th Cir. 2011); <u>see</u> Fed. R. Civ. P. 56(a), (c). "When the only question a court must decide is a question of law, summary judgment may be granted." <u>Saregama India Ltd. v. Mosley</u>, 635 F.3d 1284, 1290 (11th Cir. 2011). Contract interpretation, including whether it is ambiguous, is a question of law. <u>Id.</u> "Summary judgment is appropriate in declaratory judgment actions seeking a declaration of coverage when the insurer's duty, if any, rests solely on the applicability of the insurance policy, the construction and effect of which is a matter of law." <u>Northland Cas. Co. v. HBE Corp.</u>, 160 F. Supp. 2d 1348, 1358 (M.D. Fla. 2001) (citation omitted).

## III.  ANALYSIS

### A.  ASRRG

The Court begins its analysis by briefly addressing Gaffin's motion for summary judgment against ASRRG. ASRRG does not dispute that the CGL Policy provides Gaffin coverage for PCS's attorneys' fees and litigation expenses, but points out that coverage extends only to those fees and expenses incurred in the defense of PCS in the Williams lawsuit. (Doc. 96 at 10-11.) ASRRG already contributed $100,000 to settling the Williams lawsuit, leaving $900,000 in the CGL Policy. (<u>Id.</u> at 11.) ASRRG asks the Court not to enter judgment until PCS has set out its fees and expenses so as to identify which might be recoverable and which might exceed the CGL Policy limits. (<u>Id.</u>) Gaffin and PCS take no issue in their joint reply brief with ASRRG's position. (<u>See</u> Doc. 102.)

Upon due consideration, the Court agrees that the Purchase Order qualifies as an "insured contract" under the language of the CGL Policy such that ASRRG owes Gaffin coverage for PCS's fees and expenses up to its policy limits. (See Doc. 53-10 at 2, 12.) The Court also agrees, though, that entry of judgment is inappropriate until PCS has substantiated its fees and expenses. The Court expects PCS to provide the other parties this information before submitting it to the Court, however, and that the parties will confer towards resolving the issue without court involvement.

**B.    ASIC**

The parties are in less agreement with respect to the Excess Policy. The Excess Policy has different, arguably more restrictive language governing coverage for contractually assumed liabilities than the CGL Policy. The parties appear to share the same reading of the general terms of this coverage and to agree that, as written, coverage is not available for PCS's fees and expenses. (See Doc. 91 at 11-12; Doc. 97 at 13; Doc. 102 at 4.) But Gaffin contends that, while the policy purports to provide coverage for "insured contracts," unusual restrictions in the definition of the term make that coverage illusory. (Doc. 91 at 11; see Doc. 102 at 5.) Gaffin argues, moreover, that ASIC should have made it aware of these restrictions and should therefore now be estopped from asserting them. (Doc. 91 at 11-16; Doc. 102 at 4-8.)

ASIC responds that coverage for insured contracts is not illusory under the Excess Policy, just unavailable in this instance. (Doc. 97 at 12-13.) Furthermore, while indirectly acknowledging that estoppel may be grounds for avoiding certain coverage defenses, ASIC strongly resists extending coverage beyond the terms of the policy. (Id. at 13-16.) According to ASIC, the Excess Policy provides no coverage for PCS's fees

and expenses for a number of reasons, including that the Purchase Order is not an insured contract under the Excess Policy, that the Williams lawsuit is not a claim or suit by a "third party" as defined in the policy, and that fees and expenses are not "damages" under the policy's coverage of insured contracts. (Id. at 12-13, 16-18.)

In deciding coverage, "Florida courts start with 'the plain language of the policy, as bargained for by the parties.'" State Farm Fire & Cas. Co. v. Steinberg, 393 F.3d 1226, 1230 (11th Cir. 2004) (quoting Auto-Owners Ins. Co. v. Anderson, 756 So. 2d 29, 34 (Fla. 2000)). The Court starts with the language of the Excess Policy, as well, to determine what coverage is available before considering, as necessary, whether coverage should be extended based on estoppel.

1.   **Coverage**

The CGL Policy and the Excess Policy both generally exclude from coverage claims for "bodily injury" or "property damage" arising from Gaffin's "assumption of liability under a contract or agreement." (Doc. 53-10 at 2; Doc. 92-1 at 2.) Both policies except from this exclusion liability assumed in an "insured contract." (Doc. 53-10 at 2; Doc. 92-1 at 2.) But the definition of "insured contract" in the Excess Policy includes a requirement not included in the CGL Policy that the insured contract be an assumption of another party's tort liability to a third party for injury or damage "caused by [the insured's] negligence." (Doc. 92-1 at 12.) The Excess Policy then goes on in subsection (3) of the definition of insured contract to exclude that part of a contract "under which the insured agrees to indemnify, hold harmless, [or] defend . . . a third party for 'claims' or 'suits' directly or indirectly 'arising from' that third party's negligence, actions, inactions or status, including (without limitation) for vicarious

liability, derivative liability, strict liability or liability without fault." (Id.) No party has pointed the Court to any case construing these or similar provisions. But Gaffin and PCS contend that, taking the provisions together, "[i]t is difficult to conceive of a claim for indemnity that would not be excluded" such that coverage for insured contracts is illusory. (Doc. 90 at 12.) The Court agrees, but only to an extent.

Merely failing to cover a particular claim or occurrence does not make coverage illusory. Instead, "[w]hen limitations or exclusions completely contradict the insuring provisions, insurance coverage becomes illusory." Purrelli v. State Farm Fire & Cas. Co., 698 So.2d 618, 620 (Fla. 2d DCA 1997). When faced with such ambiguity, under Florida law, the court is to construe the contract in favor of coverage. Id.; see New York Life Ins. Co. v. Bird, 12 So.2d 454, 457 (Fla. 1943) ("Where there are conflicting clauses in an insurance policy, the one that affords the most protection to the insured will control."). "While a policy is to be interpreted to give effect to all of its provisions so far as possible, inconsistency of terms may permit, indeed require, the rejection of certain words and clauses in construction." 2 Steven Pitt, et al., Couch on Insurance § 21:9 (3d ed. 2014). "Accordingly, if two clauses are inconsistent and both were prepared by the insurer, the one which would defeat the insurance will be rejected or the one which affords the most protection to the insured will control and be given effect." Id.

The coverage provided in the general definition of insured contract in the Excess Policy—for agreements to assume another's liability for injury and damage to third parties *caused by Gaffin's negligence*—is wholly swallowed by the subsequent language that excludes from coverage such an agreement where the other party's

10

liability is based on its "negligence, actions, inactions or status, including (without limitation) *vicarious liability, derivative liability, strict liability or liability without fault.*" (Doc. 92-1 at 12 (emphasis added).) The Court has difficulty comprehending how PCS might be liable for damage caused only by Gaffin's negligence if not under a theory like vicarious, derivative, strict liability, or liability without fault. The language of subsection (3) excluding contracts covering claims where PCS is either vicariously or derivatively liable for Gaffin's negligence makes the promise of coverage in the general definition of "insured contract" illusory. Construing the ambiguity caused by this contradiction in favor of coverage, the Court gives effect to the Excess Policy's general grant of coverage for agreements to assume another's tort liability caused by Gaffin's negligence, even when the other party's liability is based on vicarious, derivative, strict liability, or liability without fault. Purrelli, 698 So.2d at 620; see Bird, 12 So.2d at 457.

Reaching this conclusion does not end the analysis, however. Gaffin encourages the Court to excise or ignore the entire exclusion in subsection (3). (See Doc. 91 at 11-12.) But the ambiguity can be resolved without such a drastic rewriting of the policy. The ambiguity is due to the contradiction in covering only contracts assuming another's liability for injury or damage caused by Gaffin's negligence while also excluding contracts that assume that other parties' liability based on vicarious, derivative, strict liability, or liability without fault. Cutting off subsection (3) before the final clause "including (without limitation) vicarious liability, derivative liability, strict liability, or liability without fault" eliminates the contradiction and allows for

11

coverage that is not illusory. Under this reading, an insured contract under the Excess Policy would be one that assumes the liability of another party for injury or damages to a third party caused by Gaffin, but does not indemnify the other party for its own negligence. This reading may provide coverage more limited than that provided by the CGL, but it is consistent with the general promise of coverage for insured contracts in the Excess Policy. Purrelli, 698 So.2d at 620; see Bird, 12 So.2d at 457.

The Court has already determined that Gaffin agreed in the Purchase Order to indemnify PCS for liability not only for Gaffin's negligence, but also for PCS's negligence when it is a "joint, concurrent, or partial (but not sole) cause" of the injury or damage at issue. (Doc. 87 at 13-14.) Regardless of whether Gaffin's negligence, PCS's negligence, or some combination thereof actually caused Williams's death, under the construction of the Excess Policy set forth above, the Purchase Order does not qualify as an insured contract and Gaffin is not covered in its indemnity obligation to PCS. Therefore, Gaffin's responsibility to pay PCS's fees and expenses in the Williams lawsuit are not covered.

## 2.   **Estoppel**

Anticipating that the exclusionary language of the Excess Policy may not provide coverage for PCS's fees and expenses, Gaffin contends that ASIC should be estopped from asserting these exclusions for failing to notify Gaffin or its broker that the insured contract provision was non-standard and did not follow the language of the CGL Policy. (Doc. 91 at 11-15.) ASIC responds that estoppel cannot be used to expand coverage not otherwise provided for in the policy. (Doc. 97 at 14.) Though ASIC ignores the limited exception to this general rule, the Court cannot find as a matter of

law that the exception applies here such that Gaffin is entitled to summary judgment.[5]

### a. *Crown Life Ins. Co. v. McBride*

"The general rule in applying equitable estoppel to insurance contracts provides that estoppel may be used defensively to prevent a forfeiture of insurance coverage, but not affirmatively to create or extend coverage." Crown Life Ins. Co. v. McBride, 517 So. 2d 660, 661 (Fla. 1987). The theory behind this general rule is that estoppel is designed to prevent a loss, not to bestow a gain. Id.

In McBride, a divided Florida Supreme Court recognized a limited exception to the general rule for the doctrine of promissory estoppel. Acknowledging it would be taking a minority view among the states, the court held that "promissory estoppel may be utilized to create insurance coverage where to refuse to do so would sanction fraud or other injustice." Id. at 662. "Such injustice may be found where the promisor reasonably should have expected that his *affirmative representations* would induce the promisee into action or forbearance substantial in nature, and where the promisee

---

[5] The Court might well be justified in denying summary judgment without reaching Gaffin's estoppel arguments as there is nothing in Gaffin's Second Amended Cross-Claim to suggest that Gaffin is asserting an estoppel theory of coverage under the Excess Policy. (See Doc. 19.) In a recent opinion also featuring American Standard companies, the Eleventh Circuit was critical of the parties and the district court for considering certain estoppel theories in support of insurance coverage that were alleged for the first time at summary judgment without amending the pleadings. Flintlock Constr. Servs., LLC v. Well-Come Holdings, LLC, 710 F.3d 1221, 1227-28 (11th Cir. 2013). Even though the insurer did not object and the district court ultimately rejected estoppel, the Eleventh Circuit directed that the district court should have simply stopped its analysis upon finding that the insurance policies had not been issued to the parties and should not have reached estoppel "as if the pleadings had been amended by implied consent." Id. at 1227-28. Being uncertain that this directive applies to this case, the Court proceeds.

shows that such reliance thereon was to his detriment." Id. (emphasis added) (citing Mount Sinai Hosp. v. Jordan, 290 So. 2d 484 (Fla. 1974)).

Two concurring opinions, mindful of the risks associated with recognizing such an exception for promissory estoppel, took comfort in signing onto the majority opinion by reiterating that the court was recognizing a rare exception that the proponent of estoppel would have to establish by clear and convincing evidence. Id. at 663-64. Justice Ehrlich, along with the two other justices who joined his opinion concurring in the result but dissenting in the majority's adoption of the exception, opined that the exception represented an unconvincing attempt "to whittle away" at the general rule against extending coverage by waiver or estoppel. Id. at 664.

Gaffin pushes for the application of the exception here, arguing that it intended and expected its insurance policies would cover its indemnity obligations to PCS and, before the accident, it had no reason to think they would not. (See Doc. 62 at 9-10.) Before the accident, Lassiter-Ware, Gaffin's broker, had received just a Confirmation of Coverage that referred only to form numbers and made no mention of exclusions or the contours of the insured contract provision. (Doc. 92-4; see Doc. 63 at 30-31.) The insurance policy itself was not delivered to Lassiter-Ware until June 25, 2007, the first time either Gaffin or its broker could have discovered the differences between the CGL Policy and Excess Policy. (Doc. 92-2, ¶ 6; Doc. 75-17 at 54, 58; see Doc. 63 at 58-59.) Moreover, Gaffin contends it had no reason to believe the language of the Excess Policy would not conform to that of the CGL Policy based on Gaffin's past insurance policies and the industry standard policy forms. (Doc. 91 at 15.) Mark Gaffin, president of the

company, asserts that he would not have bought the Excess Policy had he known it did not cover Gaffin's obligations to PCS. (Doc. 92-2, ¶ 9.)

In support of its argument that these facts amount to fraud or injustice, Gaffin cites primarily to three intermediate Florida appellate court decisions in addition to McBride and to sections 626.922 and 627.421, Florida Statutes, regarding the deadlines for delivering the insurance policies to the insured. ASIC does not cite any authority in support of its argument on this issue, but instead attempts to distinguish Gaffin's authority and to argue that the facts to do not support estoppel. The Court has reviewed the law and the facts and agrees that estoppel is not implicated here.

### b.  *JN Auto Collection Corp. v. U.S. Security Insurance Co.*

In JN Auto Collection Corp. v. U.S. Security Insurance Co., 59 So. 3d 256 (Fla. 3d DCA 2011), the Florida Fourth District Court of Appeal held that the defendant insurance company should be promissorily estopped from enforcing an exclusion in a recently-added endorsement and reversed a directed verdict in favor of the defendant insurance company.[6] Id. at 258. Before the policy in effect on the date of loss, the defendant had issued the plaintiff three prior insurance policies, but added an exclusionary endorsement in the latest renewal policy that would have excluded coverage for the loss, which occurred the day after renewal over the telephone. Id. at 257. The appellate court concluded that, under these circumstances, the defendant

---

[6] "Promissory estoppel requires proof that: (1) the promisor made a representation as to a material fact that is contrary to a later-asserted position; (2) the promisee reasonably relied on the representation; and (3) the promisee changed his or her position to his or her detriment based on the representation." Id. at 258.

had a duty to advise the plaintiff of the change in the policy terms. Id. at 258. The defendant's failure to do so constituted a misrepresentation sufficient to establish the first element of promissory estoppel. Id. Plaintiff then easily established the elements of detrimental reliance, since none of its prior policies included the endorsement, and the plaintiff's president testified that he would not have renewed the policy had he known of the endorsement. Id. In the appellate court's view, enforcing the exclusion in those circumstances would result in an injustice. Id.

The circumstances found unjust in JN Auto are not present here. There, to support its conclusion that the insurer had a duty to tell its insured about the new exclusion and that the insured reasonably believed the terms of the renewal policy would stay the same, the appellate court could point to a clear history of three policies in a row without the exclusion before it was added to the fourth without notice. Id. at 257-58. Here, the Excess Policy was the first policy issued by ASIC to Gaffin. It is difficult to conclude, based on JN Auto, that ASIC had a duty to tell Gaffin that its excess policy was different than the policy from FCCI, Gaffin's previous excess insurer. That Gaffin's prior policies with FCCI each had the same coverage for insured contracts and that they followed the industry standard forms might (arguably) make Gaffin's expectation that the Excess Policy would have the same language reasonable.[7]

---

[7] On the other hand, that the Confirmation of Coverage did not refer to the industry standard forms but to ASIC form number might be a tip-off to Lassiter-Ware, if not Gaffin, that the policy language would not be following standard terms.

Additionally, Gaffin could not have reasonably relied on the language of the CGL Policy to conclude that the Excess Policy would cover its indemnity obligations to PCS since Gaffin did not receive a copy of CGL policy before the accident either. Moreover, there is evidence that excess policies do not always follow the terms of the

Still, Gaffin's reliance in that instance would be based on the actions of its prior insurer and not on anything ASIC did or said, or failed to do or say.

### c.   Sections 627.421 and 626.922, Florida Statutes

Without any affirmative misrepresentation by ASIC that the Purchase Order would be covered as an insured contract, Gaffin and PCS point to sections 627.421 and 626.922, Florida Statutes, to support their argument that ASIC had a duty to speak. (Doc. 90 at 13-14; Doc. 91 at 12, 14-15.) Section 627.421(1) requires every policy to be delivered to the insured no later than sixty days after the effectuation of coverage. Section 626.922(4) imposes a similar sixty-day deadline for surplus lines agents to deliver a copy of the policy, cover note, or confirmation of insurance. Gaffin and PCS contend that the policy was delivered sixty-one days after coverage became effective, though ASIC disputes that. (Doc. 90 at 13-14; Doc. 91 at 12, 14-15; Doc. 97 at 15.)

But assuming ASIC did not meet its statutory obligation (and it appears ASIC did not), the Court cannot see how, in this particular case, that constitutes a misrepresentation by omission or how Gaffin was necessarily prejudiced. Williams died seventeen days after coverage under the Excess Policy became effective. Neither statute obligated ASIC or Ecker to deliver the policy or a confirmation of coverage for another forty-three days thereafter. Fla. Stat. §§ 626.922(4), 627.421(1). Even if ASIC had fulfilled its statutory duty and delivered the policy on the sixtieth day (or even in

---

underlying policy and, in fact, often do not. Gaffin's insurance broker testified that "following form" excess coverage is quite rare in the industry. (Doc. 63 at 55-57.) Neil Ecker, the surplus lines broker, also testified that, while excess insurers might follow the underlying policy on a case-by-case basis, they also add their own exclusions. (Doc. 75-17 at 66, 69.)

even half that time), it would have been too late for Gaffin to have reviewed the policy and obtained the coverage it desired. ASIC made no misrepresentation by failing to deliver the policy prior to the accident, and this failure did not prejudice Gaffin. See Aleman v. Ace Am. Ins. Co., 564 F. App'x 1016, 1017 (11th Cir. May 7, 2014) (holding that failure to timely deliver the policy pursuant to section 627.421 does not invalidate an exclusion where the insured cannot show prejudice as a result); T.H.E. Ins. Co. v. Dollar Rent-A-Car Sys., Inc., 900 So. 2d 694, 696 (Fla. 5th DCA 2005) ("Prejudice to the insured should be considered when imposing any sanction for failure to deliver a policy of insurance as required by section 627.421.").

### d. *Lloyds Underwriters at London v. Keystone Equipment Finance Corp.*

In Lloyds Underwriters at London v. Keystone Equipment Finance Corp., 25 So. 3d 89 (Fla. 4th DCA 2009), the appellate court reiterated the general rule that coverage provisions, unlike forfeiture provisions, are not subject to estoppel and waiver. Id. at 92. The vehicle and the loss at issue in that case were both plainly covered by the terms of the policy, but the policy also included a "garaging warranty" that dictated that coverage could be lost if the vehicle was not properly stored. Id. at 92-93. The appellate court held that the garaging warranty was not a coverage provision, but a forfeiture provision. Id. at 92-93. The court then found that the insurer had a duty to inform the insured of the insured's obligations under the warranty before the insurer could seek to deny coverage based on a failure to fulfill those obligations. Id. at 93-94. The insured's prior policies had no similar garaging warranty, and the insurer and the surplus line agent failed to comply with sections 626.922 and 627.421,

so the insured had no reason to know of the warranty. Id. at 92, 94-95. The Court therefore affirmed the trial court's finding that estoppel was appropriate. Id. at 95.

In this case, the parties cannot agree whether to call the various components of the insured contract provisions "exclusions," "exceptions to exclusions," "carve-outs," or something else. (See Doc. 97 at 13-14; Doc. 102 at 2.) Regardless of their label, though, the terms of the insured contract provision of the Excess Policy are undisputedly coverage provisions, an important distinction from Keystone. The court in Keystone was quick to find a duty for the insurer to advise the insured of its affirmative obligations under a forfeiture provision and further found estoppel for failing to do so. Here, Gaffin seeks to use estoppel offensively to create coverage. To do so, Gaffin, unlike the plaintiff in Keystone, must identify misrepresentations by ASIC that would make it a fraud or injustice to give effect to the terms of the insured contract provision. McBride, 517 So. 2d at 662. With these key differences, Keystone does not control the outcome in this case.

### e.   *ZC Insurance Co. v. Brooks*

The case Gaffin cites that most closely approaches the facts in this case is ZC Insurance Co. v. Brooks, 847 So. 2d 547 (Fla. 4th DCA 2003), though it, too, is distinguishable. The appellate court in Brooks affirmed summary judgment in favor of the insured, refusing to enforce an exclusion for injuries to family members contained in a supplemental liability policy for a rental car. Id. at 550. The car rental agreement itself explained that the standard insurance policy excluded family members. Id. at 549. But the customer in Brooks also purchased the supplemental liability policy, and the rental agreement was silent as to whether that policy excluded

family members, referring instead to a summary of exclusions contained in a separate brochure. Id. The separate brochure was kept behind the rental counter and only given to customers on request. Id. at 550. When the customer was in an accident after leaving the rental facility, the insurance company denied coverage for injuries to the customer's daughter, a passenger in the car. Id.

The majority of the appellate court agreed with the trial court that the insurer complied "with neither the letter nor the spirit" of § 627.421 by not providing the customer with information about the exclusions to the supplemental policy and, instead, requiring the customer to search out the summary promised in the rental agreement. Id. Citing McBride, the majority concluded that "providing [the customer] with documents that define coverage while failing to provide documents that set forth the exclusions to that coverage is tantamount to fraud by omission." Id. at 551. Section 627.421(3) demonstrated, in the majority's view, that the Florida legislature's desire for automobile policyholders in particular to have sufficient information about coverage, including exclusions. Id. The rental agreement was "particularly misleading," however, because it did set forth the family member exclusion for the general policy, but was silent as to the exclusion in the supplemental policy. Id.

The dissent in Brooks took issue with the majority's reading of McBride that estoppel from enforcing an exclusion would be appropriate without an affirmative misrepresentation by the insurer. Id. at 551-52. The dissent also questioned the applicability of section 627.421 and whether it could be violated by an inadequate rental agreement, rather than a policy.

To stretch the holding of <u>Brooks</u> to fit the facts of this case would be to let the limited exception recognized in <u>McBride</u> swallow the general rule against creating coverage by estoppel. Instead, when examined more closely, the facts of <u>Brooks</u> do not support expanding its holding to this case.

The majority in <u>Brooks</u> found fraud by omission based on a duty to disclose because the rental agreement had already advised the customer that the general policy included the family member exclusion. <u>Id.</u> at 551. In light of that initial disclosure, the rental agreement's silence as to the supplemental policy could mislead the customer into believing that policy did not have such an exclusion. <u>Id.</u> ("Florida law recognizes that fraud can occur by omission, and places a duty on one who undertakes to disclose material information to disclose that information fully.") Moreover, the rental agreement promised a summary of exclusions to the supplemental policy, but then did not actually provide the summary. <u>Id.</u>

Here, as Gaffin acknowledges, ASIC never undertook to summarize or even identify the exclusions in the Excess Policy, but only referenced policy form numbers in the Confirmation of Coverage. (<u>See</u> Doc. 91 at 7.) It is hard to see how that limited disclosure could give rise to a duty to disclose all the exclusions to the policy.[8] Without any affirmative misrepresentation or duty to disclose, Gaffin has failed to establish the first element of promissory estoppel.

_____

[8] It is also worth noting that the majority in <u>Brooks</u> relied on the fact that Florida law imposes additional disclosure requirements on automobile insurers in particular, including that auto policies have a front page "'summary of major coverages, conditions, exclusions, and limitations contained in that policy.'" <u>Brooks</u>, 847 So.2d at 550 (quoting Fla. Stat. § 627.421(3)). There is no such requirement here.

The Court's review of the Florida cases leads to the conclusion that promissory estoppel does not apply on these facts. Gaffin's motion for summary judgment is therefore due to be denied.[9]

## IV.   CONCLUSION

Though it may be how the insurance industry works, it seems curious that neither an insured nor (apparently) its broker knew (or inquired about) the actual coverage provided by its excess policy until receiving the policy sixty-one days after it became effective. It is also not unreasonable for the insured to want and expect its excess coverage to be coextensive with its general liability coverage. Still, the Court must ultimately employ the principles of insurance contract interpretation to give effect to the provisions of the Excess Policy that Gaffin did purchase. See State Farm Fire & Cas. Co. v. Castillo, 829 So. 2d 242, 247 (Fla. 3d DCA 2002) ("[I]t is the policy's terms which define the coverage, not the insured's reasonable expectations.")

Having now resolved the main issues, the Court still cannot yet enter judgment. Not only is there the outstanding issue of what amount of PCS's fees and expenses are recoverable under the CGL Policy, but ASIC has not cross-moved for summary judgment. The Court may "grant summary judgment for a nonmovant," however, "[a]fter giving notice and a reasonable time to respond." Fed. R. Civ. P. 56(f); see Gentry v. Harborage Cottages-Stuart, LLLP, 654 F.3d 1247, 1261 (11th Cir. 2011); Smith v. School Bd. of Orange Cnty., 487 F.3d 1361, 1367-68 (11th Cir. 2007).

---

[9] Because of its coverage ruling, the Court need not reach the other arguments against coverage raised in ASIC's response. (See Doc. 97 at 16-20.)

The Court hereby notifies the parties that it intends to enter judgment in favor of ASIC for the reasons set forth above after Gaffin and PCS have had a reasonable time to respond and ASIC a reasonable time to reply. But the Court expects the parties should be able to resolve this issue and the amount of fees and expenses under the CGL Policy without further court involvement. Therefore, before entering yet another briefing schedule, the Court will direct the parties to meet and confer and report on the status of the case.

Accordingly, it is hereby

**ORDERED**:

1.     Gaffin Industrial Services, Inc.'s Motion for Summary Judgment on Cross-Claim against Defendant American Safety Risk Retention Group, Inc. (Doc. 91), which also moves for summary judgment on Gaffin's cross-claim against American Safety Indemnity Company, is **GRANTED in part** and **DENIED in part** as stated herein.

2.     On or before **May 1, 2015**, the parties shall file a joint notice advising the Court of the status of the case.

3.     The Clerk is directed to administratively close the case pending the parties' report.

**DONE AND ORDERED** at Jacksonville, Florida this 10th day of March, 2015.

TIMOTHY J. CORRIGAN
United States District Judge

bjb
Copies to:

Counsel of record